PROTECTIVE LIFE INSURANCE COMPANY *vs.* DENNIS J.
SULLIVAN & others.[1]

Suffolk. February 5, 1997. - July 29, 1997.

Present: WILKINS, C.J., LYNCH, O'CONNOR, FRIED, & MARSHALL, JJ.

*Administrative Law,* Agency's interpretation of statute. *Statute,* Construction.
*Insurance,* Life insurance, Fraud and concealment, Misrepresentation.
*Limitations, Statute of. Repose, Statute of.*

Where the legislative history of G. L. c. 175, §§ 124 & 132, evinces no
legislative intent that there be a fraud exception to the uncontestability
statute (§ 132) applicable to policies of life insurance, and where the
absence of a fraud exception does not violate public policy, this court
declined to imply such an exception, with the result that the incontest-
ability statute barred rescission of a life insurance policy on the basis of
fraud after two years. [619-630]
The doctrine of equitable tolling was not applicable to toll the incontestability
period set forth in G. L. c. 175, § 132, in circumstances in which an ap-
plicant for life insurance misrepresented his medical condition and then
"concealed" his misrepresentation by delaying an application for waiver of
premiums due to his disability for the two years during which the insurer
could contest the policy, where the insurer could have discovered the fraud
in the exercise of reasonable diligence within the two-year period and
where the insured did not perform any affirmative acts to conceal the exist-
ence of his original fraud in the application. [630-632]

CERTIFICATION of questions of law to the Supreme Judicial
Court by the United States Court of Appeals for the First Circuit.

*Luke DeGrand* of Illinois (*Wayne S. Henderson* with him) for
Dignity Viatical Settlement Partners, L.P., & another.

*John A. Shope* (*John H. Henn* with him) for the plaintiff.

The following submitted briefs for amici curiae:

*Elliott M. Kroll, Mark S. Fragner, & Lori M. Meyers* of New
York, for the Cancer Care, Inc., & others.

*Bennett H. Klein & Gary Busek* for the AIDS Law Project of
Gay & Lesbian Advocates and Defenders & others.

---

[1]Dignity Viatical Settlement Partners, L.P., and Dignity Partners, Inc.

*Rita M. Theisen & Phillip E. Stano* of the District of Columbia, for the American Council of Life Insurance.

*Daniel R. Judson & Daniel L. Swift*, Special Assistant Attorneys General, for the Commissioner of Insurance.

MARSHALL, J. Protective Life Insurance Company (Protective Life) commenced the underlying action in the United States District Court for the District of Massachusetts seeking rescission of a life insurance policy issued by it to the defendant Dennis J. Sullivan, a resident of Massachusetts. Protective Life claimed that Sullivan obtained the policy through fraudulent misrepresentation. The policy form, which had been approved by the Commissioner of Insurance (commissioner), provided that Protective Life could not "bring any legal action to contest the validity of this policy after it has been in force for two years except for failure to pay the premiums *unless fraud is involved*" (emphasis supplied). The defendants moved to dismiss the action, asserting that the plaintiff's action to rescind the policy more than two years after its date of issue was prohibited by G. L. c. 175, § 132, the Massachusetts incontestability statute. A judge of the United States District Court denied the motion.

After a bench trial, the District Court judge found by clear and convincing evidence that Sullivan had committed fraud, and on November 17, 1995, entered judgment in favor of Protective Life against Dignity Viatical Settlement Partners, L.P., and Dignity Partners, Inc. (collectively, Dignity).[2] Dignity appealed and, on its own motion, the United States Court of Appeals for the First Circuit certified the following two questions of State law to this court pursuant to S.J.C. Rule 1:03, as appearing in 382 Mass. 700 (1981):

"1. Does Mass. Gen. L. ch. 175, § 132, taken together with § 124, bar an insurance company from contesting the validity of a life insurance policy more than two years after its date of issue on the ground that the insured made fraudulent misrepresentations in applying for the policy, where the policy provided that it was contestable for fraud at any time and where the Massachusetts Commissioner of Insurance approved the policy form?

"2. If the incontestability statute bars such an action, is

---

[2]Sullivan died from complications associated with Acquired Immune Deficiency Syndrome (AIDS) on April 4, 1995, and the claims against him were dismissed.

the contestability period nonetheless equitably tolled under the circumstances of this case by Sullivan's failure to apply for the disability waiver to which he was entitled until two years after the policy was issued?"

*Protective Life Ins. Co.* v. *Sullivan*, 89 F.3d 1, 4-5 (1st Cir. 1996). We answer the first question certified in the affirmative, and the second question certified in the negative.

I

We summarize the facts relevant to the questions certified. See S.J.C. Rule 1:03, § 3 (2). In November, 1990, Sullivan was first diagnosed as Human Immunodeficiency Virus (HIV) positive and began a course of treatment including use of the drug AZT. On September 24, 1991, Sullivan applied to Protective Life for a life insurance policy in the amount of $100,000, with an annual premium of $175. In his application, he falsely stated that he was not taking any medication, and he omitted the names of those doctors who knew of his diagnosis. Sullivan authorized Protective Life to conduct medical tests, including a test for HIV infection, but on November 8, 1991, Protective Life issued a policy to Sullivan without having ordered an HIV or any other medical test. The policy included an optional provision that, for an increase in the annual premium, gave Sullivan the right to waive the premium in the event he became disabled.

In 1992, Sullivan's health worsened and by June, 1992, Sullivan's HIV infection had progressed to Acquired Immune Deficiency Syndrome (AIDS), and he stopped working. In October, 1992, Sullivan applied for disability benefits from another insurance company. He did not apply to Protective Life for a waiver of his life insurance premiums due to his disability until November 8, 1993, exactly two years after Protective Life had issued its policy to Sullivan.

In October, 1993, Sullivan informed Protective Life through a broker that he wished to assign ownership of his policy to Dignity, a firm engaged in making viatical settlements, agreements under which an insured sells a life insurance policy for an immediate payment approximating the discounted face value of the policy. On December 14, 1993, Dignity delivered the assignment forms to Protective Life, which Protective Life approved on December 22, 1993. On the same day, Dignity paid Sullivan $73,000.

It is undisputed that Sullivan knew he was HIV positive when he applied for the life insurance policy, and that he failed to disclose in his application that he was receiving medical treatment and any medication for his condition, despite questions calling for this information. It is also undisputed that Protective Life would not have issued Sullivan the policy had it known his true medical condition.

## II

The first question certified asks whether G. L. c. 175, § 132, taken together with G. L. c. 175, § 124, bars an insurance company from contesting the validity of a life insurance policy more than two years after its date of issue on the basis of fraud, where the policy provided that it was contestable for fraud at any time and where the policy form was approved by the commissioner.

The commissioner's approval of Protective Life's life insurance policy form (in this case with a fraud exception to incontestability) reflects the commissioner's interpretation of G. L. c. 175, § 132, as permitting an implied exception for fraud.[3] See *Colby* v. *Metropolitan Prop. & Cas. Ins. Co.*, 420 Mass. 799, 806 (1995) (by approving policy in issue commissioner's view of statute made clear); *Flanagan* v. *Liberty Mut. Ins. Co.*, 383 Mass. 195, 196 n.3 (1981) (policy form approved by commissioner might have purported to resolve any statutory ambiguity). The proper interpretation of that statute is a question of law, and we review the commissioner's interpretation de novo. See *Raytheon Co.* v. *Director of the Div. of Employment Sec.*, 364 Mass. 593, 595 (1974). In general, we grant substantial deference to an interpretation of a statute by the administrative agency charged with its administration. See, e.g., *Gateley's Case*, 415 Mass. 397, 399 (1993), and cases cited. But this principle is one of deference, not abdication, and we have overruled an agency's interpretation when it is contrary to the plain language of the statute and its underlying purpose. See *Massachusetts Hosp. Ass'n, Inc.* v. *Department of Medical Sec.*, 412

---

[3]In an amicus curiae brief submitted to this court, the commissioner argues that, under G. L. c. 175, §§ 124 and 132, only life insurance policies issued *without a medical examination* can be contested for fraud at any time, including beyond the two-year incontestability period. We note, however, that the policy form approved by the commissioner is not limited to policies to be issued without a medical examination.

Mass. 340, 346 (1992); *Kszepka's Case*, 408 Mass. 843, 847 (1990). "While we will not lightly second-guess the Commissioner's interpretation of a statute, his approval is 'hardly persuasive' where the [interpretation] violates the language and policy of the statute." *Cardin* v. *Royal Ins. Co.*, 394 Mass. 450, 456-457 (1985), quoting *Surrey* v. *Lumbermens Mut. Cas. Co.*, 384 Mass. 171, 178 (1981).

We have not before squarely decided the issue whether G. L. c. 175, § 132, read together with G. L. c. 175, § 124, permits an insurer to include a fraud exception to the required two-year contestability period for life insurance policies.[4] Our analysis begins, as it must, with the language of the statute itself. See *Massachusetts Bay Transp. Auth.* v. *Massachusetts Bay Transp. Auth. Retirement Bd.*, 397 Mass. 734, 738 (1986). General Laws c. 175, § 132, provides, in relevant part, that no life insurance policy may be issued in the Commonwealth unless it contains in substance the following:

"2. A provision that the policy shall be incontestable after it has been in force during the lifetime of the insured for a period of two years from its date of issue except for non-

---

[4]The fraud exception included in Protective Life's policy, and approved by the commissioner, is void and of no effect if such an exception is not permitted under G. L. c. 175, § 132. G. L. c. 175, § 132 (12). See, e.g., *Bonitz* v. *Travelers Ins. Co.*, 374 Mass. 327, 331 (1978), quoting *New York Life Ins. Co.* v. *Hardison*, 199 Mass. 190, 194-195 (1908) ("The incontestability clause in the policy in suit does not conform to the provision required . . . . [T]he provision in the policy must read as 'in every way as advantageous to the insured and as desirable as the prescribed provision' "). See also 1A J.A. Appleman & J. Appleman, Insurance Law and Practice § 332, at 382 (1981) ("Even though the policy specifically excepts from the operation of the incontestable clause the defense of fraud, if the statute requires such policy to contain a clause not excepting fraud, then the court will construe the exception out of the policy"); R.E. Keeton & A.I. Widiss, Insurance Law § 6.6(d), at 694 (1988) ("A policy clause declaring the contract unenforceable in case of fraud of the applicant cannot be permitted generally to bypass the incontestability clause since it would defeat the central objective of the clause"); 18 G. Couch, Insurance § 72.27 (2d ed. rev. 1983) ("An incontestable clause cannot, by excepting fraud, prevent the operation of a statute which provides that all life insurance companies which shall receive the premium on any policy for the space of 2 years shall be deemed and taken to have waived any right they may have had to dispute the truth of the application for insurance or to claim that the insured made false representations . . .").

payment of premiums or violation of the conditions of the policy relating to military or naval service in time of war and except, if the company so elects, for the purpose of contesting claims for total and permanent disability benefits or additional benefits specifically granted in case of death by accident."

Thus G. L. c. 175, § 132, requires all Massachusetts life insurance policies to provide that, after the policy has been in force during the lifetime of the insured for two years, the policy cannot be contested by the insurer for any but three specific reasons. There is no exception for fraud.

We have said that "[t]he fact that the Legislature specified one exception . . . strengthens the inference that no other exception was intended." *LaBranche* v. *A.J. Lane & Co.*, 404 Mass. 725, 729 (1989).[5] See *Bagley* v. *Illyrian Gardens, Inc.*, 401 Mass. 822, 824 (1988) ("Expressio unius est exclusio alterius"); *Collatos* v. *Boston Retirement Bd.*, 396 Mass. 684, 687 (1986) ("it is appropriate to follow the maxim that the statutory expression of one thing is an implied exclusion of other things omitted from the statute"); *Harborview Residents' Comm., Inc.* v. *Quincy Hous. Auth.*, 368 Mass. 425, 432 (1975), and cases cited. See also 2A C. Sands, Sutherland Statutory Construction § 47.23, at 217 (5th ed. 1992). Although a maxim of statutory construction is not to be followed "slavishly" where to do so would undermine the legislative purpose behind a statute, *Bagley*, *supra* at 825, and cases cited, we are persuaded that the

---

[5]In construing incontestability statutes that do not contain a specified exception, courts in other jurisdictions also have reached the conclusion that only those exceptions specified in the statute can be enforced. See *National Life & Cas. Ins. Co.* v. *Blankenbiller*, 89 Ariz. 253, 256 (1961) ("The majority rule is that every exception to incontestability not expressed in the statute itself is specifically barred as a defense to the policy after the expiration of the incontestability period"); *Sun Life Assur. Co.* v. *Allen*, 270 Mich. 272, 281 (1935) ("The statute carries the only permissible exceptions to its bar, and its construction falls within the rule that the inclusion of an exception excludes everything else"). See also W.F. Meyer, Life and Health Insurance Law §§ 8:1 & 8:2, at 226-228 (1972) (setting forth New York's incontestability clause, N.Y. Ins. Law § 155-1[b], nearly identical to G. L. c. 175, § 132, and stating that no fraud exception is permitted); 2 W. Freedman, Insurance § 11:7, at 291 (6th ed. 1990) ("Fraud, when not among the exceptions [to the incontestability clause], is covered").

Legislature's omission of an exception for fraud in G. L. c. 175, § 132 (2), reflects its intent that there be no such exception.[6]

This has particular relevance here because the Legislature has demonstrated that, when it intends to have a fraud exception to an incontestability statute, it knows how to create one. General Laws c. 175, § 108 (3) (*a*) (2), sets forth the incontestability provision required in all health insurance policies issued in this Commonwealth. That statute specifically excepts "fraudulent misstatements": "After two years from the date of issue of this policy no misstatements, except fraudulent misstatements, made by the applicant in the application for such policy shall be used to void the policy or to deny a claim for loss incurred or disability as defined in the policy commencing after the expiration of such two-year period." See *Commonwealth* v. *LeBlanc*, 407 Mass. 70, 75 (1990) (Legislature's omission of language in one statute, and inclusion of same language in other statutes, indicates that Legislature in fact intended to omit that language where it is absent); *Tilcon Mass., Inc.* v. *Commissioner of Revenue*, 30 Mass. App. Ct. 264, 269 (1991) (it is a "canon of statutory construction that, if specific language appears in one section of a statute and is absent from a related section, the absent language should not be read into the provision from which it is missing").[7]

Protective Life argues that our interpretation of G. L. c. 175, § 132, is inconsistent with G. L. c. 175, § 124, which, it argues,

---

[6]We recognize that Protective Life claims that no exception is required because G. L. c. 175, § 124, supplies the fraud exception. That argument is considered *infra* at 621-623.

[7]Dignity advances a plausible explanation for the Legislature's omission of a fraud exception to incontestability in the context of life insurance but not in the context of health insurance. In a contract for life insurance, the insurer's liability is fixed and definite. The insurer promises to pay a sum certain, and no more. In a contract for health insurance the insurer's liability is far less certain or predictable. Moreover, health insurance policy contests generally occur during the life of the insured, and thus the insured will be available to defend against an insurer's claim of fraud. Life insurance policy contests, on the other hand, generally occur after the death of the insured, leaving the beneficiaries with the task of defending against an insurer's charge that the deceased committed fraud. In light of these differences, we cannot conclude that the Legislature's differing treatment of the two kinds of insurance was unintended or irrational. See *Fioretti* v. *Massachusetts Gen. Life Ins. Co.*, 892 F. Supp. 1492, 1498-1499 (S.D. Fla. 1993), aff'd, 53 F.3d 1228 (11th Cir. 1995), cert. denied, 516 U.S. 1046 (1996) (offering reasons for differing treatment of life and health insurance with respect to inclusion of a fraud-at-the-inception exception to incontestability).

does allow insurers to contest for fraud at any time those policies issued without a medical examination.[8] On Protective Life's reading of G. L. c. 175, §§ 124, 132, and 186,[9] a life insurance policy issued without a medical examination can be contested within two years of the date of issue on the ground that the insured made a material misrepresentation. After two years have passed, insurers must prove not only materiality, but also wilful fraudulent intent on the part of the insured.[10] We disagree with Protective Life's interpretation of the statutory scheme.

General Laws c. 175, § 124, first enacted in 1892 (St. 1892, c. 372), fifteen years before the Legislature enacted any incontestability statute, provides:

> "In any claim arising under a policy issued in the commonwealth by any life company, without previous medical

---

[8]Protective Life draws our attention to decisions from other jurisdictions in which courts have held that, even where there is no exception for fraud to the relevant incontestability statute, there is an exception where someone other than the insured — an impostor — submits to the insured's medical examination or blood tests. See, e.g, *Fioretti* v. *Massachusetts Gen. Life Ins. Co.*, 53 F.3d 1228, 1237 (11th Cir. 1995) (interpreting New Jersey law). Cf. *Bankers Sec. Life Ins. Soc'y* v. *Kane*, 885 F.2d 820, 822 (11th Cir. 1989) (interpreting Florida law and reaching contrary result); *Amex Life Assur. Co.* v. *Superior Court of Los Angeles*, 14 Cal. 4th 1231 (1997) (reaching contrary result). Protective Life suggests that if we should want to follow the lead of those jurisdictions that have recognized an "impostor" exception to incontestability, then Protective Life's interpretation of G. L. c. 175, § 124, would permit the courts to reach that result. We simply note that we are not confronted here with an "impostor" case.

[9]General Laws c. 175, § 186, provides, in relevant part:

> "[n]o oral or written misrepresentation or warranty made in the negotiation of a policy of insurance by the insured or in his behalf shall be deemed material or defeat or avoid the policy . . . unless such misrepresentation or warranty is made with actual intent to deceive, or unless the matter misrepresented or made a warranty increased the risk of loss."

[10]The commissioner offers a somewhat different interpretation of those statutes. In the commissioner's view, insurers who contest life insurance policies issued without a medical examination must always prove actual fraud in order to prevail, regardless of when the action is commenced. However, the commissioner asserts that the two-year contestability period required by G. L. c. 175, § 132, does not apply to life insurance policies issued without a medical examination. We reject the commissioner's analysis of the statutory scheme as well.

examination . . . the statements made in the application as to the age, physical condition and family history of the insured shall be held to be valid and binding on the company; but the company shall not be debarred from proving as a defense to such claim that said statements were wilfully false, fraudulent or misleading."

We are persuaded that the purpose of G. L. c. 175, § 124, was to raise the burden of proof that an insurer must sustain when it contests a life insurance policy issued without a medical examination. It could not have been intended to create an exception to the later-enacted incontestability statute.

We believe that the statutory history confirms this interpretation. In *Torres* v. *Fidelity & Guar. Life Ins. Co.*, 34 Mass. App. Ct. 376 (1993), the Appeals Court discussed the interrelationship between G. L. c. 175, § 124, and § 186. Section 186, applicable to all insurance policies, specifies that an insured's misrepresentation is not "material" unless it is made with actual intent to deceive or unless it increases the risk of loss to the insurer.[11] *Id.* at 377. Section 124, adopted fourteen years after the adoption of G. L. c. 175, § 186 (St. 1878, c. 157), imposes a heavier burden on the insurer when it contests a life insurance policy issued without a medical examination. *Id.* at 377-378. Statements in applications for life insurance policies issued without a medical examination are binding on the insurer unless it proves that the statements were wilfully false, fraudulent, or misleading. *Id.*

Protective Life argues that G. L. c. 175, § 124, was designed to encourage insurers to issue policies without medical examinations by permitting contests for fraud without limitation. Our reading of the statutory history is different. In its attempt to discern the legislative intent behind G. L. c. 175, § 124, the Appeals Court in *Torres* relied in part on statements made by the commissioner in annual reports submitted to the Legislature in the years preceding the enactment of G. L. c. 175, § 124. *Id.* at 378-379. The court quoted from the Thirty-third Annual Report of the Insurance Commissioner, Pub. Doc. No. 9, at vii (1888):

"if . . . risks are taken without a medical examination, al-

---

[11] In *Employers' Liab. Assur. Corp.* v. *Vella*, 366 Mass. 651, 654-655 (1975), we held that, even if the insured makes a representation with the "actual intent to deceive," the policy is not voidable under § 186 unless the misrepresentation increased the risk of loss to the insurer.

leged misrepresentation by the applicant — who in a large number of these cases is made to understand next to nothing of the statement he is asked to sign — as to his physical condition, ought not to be permitted as a bar when a claim arises. Misrepresentation by the agent and misunderstanding by the assured now lead, under the methods thus pursued, to almost innumerable cases of hardship and injustice." *Id.* at 379.

In 1889, the commissioner repeated his recommendation that insurance contracts issued without a medical examination should not be subject to a claim that misrepresentation bars payment:

"Experience only the more strongly commends the suggestion made in this report last year; that, when any company issues [a life insurance] policy . . . no matter for how small an amount, - with no medical examination, it should be forbidden by law from setting up, as a bar to an accrued claim, alleged misrepresentation by the applicant as to his physical condition. *It is the business of the company to ascertain whether lives presented for insurance are impaired*; and, if it chooses to waive any pretence of an examination to test this vital question, the responsibility should be upon itself. Existing contrary practice leads to a wilderness of misunderstanding and misrepresentation, with hardships and losses to a class of people illy able to bear it." (Emphasis supplied.) Thirty-fourth Annual Report of the Insurance Commissioner, Pub. Doc. No. 9, at vii (1889).

The commissioner made this same recommendation again in his 1891 report, submitted to the Legislature in the year immediately preceding its enactment of G. L. c. 175, § 124. The commissioner stated that he

"would repeat and emphasize the suggestion, twice before made in these reports, that when any company effects insurance upon a life, without medical examination, it should be forbidden from setting up, as a bar to any claim, alleged misrepresentation by the insured as to his family history or his physical condition at the time the policy was issued . . . . Doubtless four-fifths of the misunderstanding, disappointment and loss in this class of business, now

grown to vast magnitude, arise from these grave defects . . . which ought to be speedily and radically remedied." Thirty-sixth Annual Report of the Insurance Commissioner, Pub. Doc. No. 9, at viii (1891).

General Laws c. 175, § 186, already had been enacted when the commissioner made these recommendations in 1888, 1889, and 1891. The purpose of G. L. c. 175, § 124 (based on the commissioner's recommendation), was to curb perceived unfair practices by insurance companies, by making it even more difficult for them to contest life insurance policies issued without medical examinations than it was to contest life insurance policies issued with medical examinations. We conclude, therefore, that the effect of G. L. c. 175, § 124, when read together with the later-enacted § 132 (see St. 1907, c. 576, § 75), is to increase the insurers' burden of proof when it attempts to rescind, within two years, life insurance policies issued without medical examinations.[12] Neither the purpose nor the effect of G. L. c. 175, § 124, was to create a fraud exception to the later-enacted incontestability statute.

The legislative history of G. L. c. 175, § 132, such as it is, confirms our interpretation. First, we note that as first enacted in 1907, the terms of G. L. c. 175, § 132, were slightly different from the present statute. Statute 1907, c. 576, § 75, read as follows:

---

[12]In 1907 when the Legislature finally enacted G. L. c. 175, § 132, the incontestability statute, it simultaneously prohibited insurers from issuing life insurance policies without a medical examination (St. 1907, c. 576, § 71). That same year it repealed Rev. L. 118, § 73 (1902), and reenacted its language, see St. 1907, c. 576, §§ 73, 122, presumably to cover policies that had been issued without a medical examination prior to January 1, 1908, the effective date of the new statute. Later, in 1943, the Legislature once again permitted life insurance policies to issue without a medical examination, but only for policies for $5,000 or less, see G. L. c. 175, § 123, as appearing in St. 1943, c. 186, and in 1952 the Legislature deleted the requirement for a medical examination for policies in excess of $5,000, see G. L. c. 175, c. 123, as amended by St. 1952, c. 14. The commissioner suggests that the Legislature would not have intended to treat two sets of policies issued without a medical examination differently, viz., those issued before January 1, 1908, and those issued after 1943. But we do not view the result we reach today as requiring that result. The 1907 incontestability statute by its terms was applicable to all insurance policies. While we recognize that, as of that date, no new insurance policies issued without a medical examination, the higher burden of proof required to void insurance policies issued without a medical examination did apply to any policies not yet beyond the two-year incontestability period.

"2. A provision that the policy shall be incontestable after
two years from its date of issue except for nonpayment of
premiums and for engaging in military or naval service in
time of war without the consent in writing of an executive
officer of the company."

Thus, the exceptions to the original incontestability statute were
even more narrow than the three exceptions currently permitted.
See G. L. c. 175, § 132.

In the Fifty-first Annual Report of the Insurance Commis-
sioner, Pub. Doc. No. 9, at xxiv (1906), submitted one year
before the enactment of G. L. c. 175, § 132, the commissioner
wrote:

"It may also serve to refresh the memory as to why some
life insurance presidents are now in exile and officers of
high rank under indictment; why unlimited confidence
cannot be placed in the advice proffered by some others,
who still occupy responsible positions; why it is necessary
for legislation to cover so many questions relating to life
insurance, and to do it with such unsparing firmness; why
the freedom which some companies merit, and would not
abuse, cannot be granted; why the public expressed such
resentment and still shows it when approached on the
subject of life insurance. . . . [The abuses by the
companies] warrant legislation, which will, if possible,
prevent recurrence of the abuses to which life insurance
has for the past few years been subject."

In 1906, the Commission to Recodify the Insurance Laws is-
sued its report to the Governor. 1906 House Doc. No. 1375.
With respect to the question whether the Massachusetts
Legislature should require "standard forms for life insurance
policies," the Commission rejected that idea as "undesirable,"
but recommended that "certain provisions should be standard-
ized, and the companies be left free to adopt policies not
inconsistent with those required by law." 1906 House Doc. No.
1375 at 53. The Commission recommended that companies "be
required" to include certain provisions including: "2. Incontest-
ability except for non-payment of premiums after one or two
years from the date of the policy." *Id.* at 54.

In 1907, the Joint Special Committee on Insurance Appointed

to Revise and Amend the Insurance Laws issued its report, proposing that standard life insurance policy forms be used in the Commonwealth. 1907 House Doc. No. 1085. The Committee suggested that all life insurance policies contain the following provision:

> "INCONTESTABILITY. - This policy constitutes the entire contract between the parties and shall be incontestable from its date except for non-payment of premiums and except as otherwise provided in this policy. All statements made by the insured shall in the absence of fraud be deemed representations and not warranties and no such statement shall avoid this policy unless it is contained in a written application and a copy of such application shall be endorsed upon or attached to this policy when issued." 1907 House Doc. No. 1085 at 121, 128, 135, 141, 146, and 152.

The Legislature in 1907 did not adopt the Committee's proposal to promulgate standard life insurance policy forms. That same year, however, the Legislature did enact the Commonwealth's first incontestability statute, G. L. c. 175, § 132. We conclude that the Legislature did not intend to create any fraud exception to the incontestability statute.

We are also not persuaded that our interpretation of the interplay between G. L. c. 175, § 132, and G. L. c. 175, § 124, would violate any public policy.[13] In *Reagan* v. *Union Mut. Life*

---

[13]A leading insurance law commentator has described the significant public policy rationale for incontestability statutes such as G. L. c. 175, § 132:

> "[T]here are conflicting forces of public policy which affect the matter of contestability. If an applicant chooses to gamble when he seeks a policy of life insurance, he may be guilty of outrageous fraud, and if the insurer fails to uncover such fraud within the contestable period he has been successful. Even if he makes such discovery in time, he receives back his premiums so that he has suffered no loss. On the other hand, only a miniscule percentage of the population ever resorts to such devious conduct, and it is considered desirable to have a cutoff time as to ordinary misrepresentations for two reasons: first, to lighten the burden upon the courts, since litigation otherwise could be increased manyfold; second, since most contests would arise after the insured's death, a beneficiary is in a deplorable condition to wage battle with a large insurer over statements which may have been made years earlier. For these reasons, it is better to countenance the occasional risk of fraud in order to bring an end to the controversy."

1A J.A. Appleman & J. Appleman, Insurance Law and Practice § 311, at

*Ins. Co.*, 189 Mass. 555, 559 (1905), decided two years before the incontestability statute was first adopted by the Legislature, we ruled that a policy provision that precluded all contests after the date of the issuance of the policy, without affording the insurer *any* reasonable time to investigate and initiate appropriate contests, was void as against public policy. We observed, however:

> "This is not like the numerous cases in which the policy provides that it shall be incontestable for fraud after the expiration of a specified time, which is not unreasonably short. It has often been held that a provision of that kind is valid because it is in the nature of a limitation of the time within which the [insurer] may avoid the policy for this cause. Such a provision is reasonable and proper, as it gives the insured a guaranty against possible expensive litigation to defeat his claim after the lapse of many years, and at the same time gives the company time and an opportunity for investigation, to ascertain whether the contract should remain in force. It is not against public policy as tending to put fraud on a par with honesty" (citations omitted).[14] *Id.* at 556.

Our view is reflected in our later discussion of the incontestability clause and its purposes in *Metropolitan Life Ins. Co.* v. *DeNicola*, 317 Mass. 416, 418 (1944):

> "[The incontestability clause] is designed to require the insurer to investigate and act with reasonable promptness if it wishes to deny liability on the ground of false representation or warranty by the insured. It prevents an insurer from lulling the insured, by inaction, into fancied security during the time when the facts could best be ascertained and proved, only to litigate them belatedly, possibly after the death of the insured. The insurer, within

---

305-306 (1981).

[14]Protective Life notes, correctly, that we held in *Reagan* v. *Union Mut. Life. Ins. Co.*, 189 Mass. 555 (1905), that an incontestability clause may be reasonably construed as having an implied exception for fraud. *Id.* at 557-558. But that was so where the incontestability period commenced on the signing of the policy and not within a period of time "not unreasonably short." *Id.* at 556. In this case Protective Life had two years within which it could investigate for fraud.

the period prescribed by the policy, must contest the policy, that is, must set up its invalidity in some judicial proceeding, by way either of attack or of defence."[15]

There were sound policy reasons why the Legislature adopted a requirement that life insurance policies issued in Massachusetts contain incontestability provisions.[16] The Legislature was, at the time, cognizant of the possibility that an insured might obtain a policy by fraudulent misrepresentations to the insurance company. It nevertheless declined to include — as it surely could have — an exception to incontestability for fraud. Where the Legislature has not provided for a fraud exception to the incontestability provision, and where the absence of a fraud exception does not violate public policy, we shall not imply such an exception. See *Cardin* v. *Royal Ins. Co.*, 394 Mass. 450, 456 n.6 (1985) ("We . . . reject as an inappropriate intrusion into the legislative function the idea that we should enforce exclusions which may appeal to us as reasonable and appropri-

---

[15]See *Wischmeyer* v. *Paul Revere Life Ins. Co.*, 725 F. Supp. 995, 1000 (S.D. Ind. 1989), quoting 7 S. Williston, Contracts § 912, at 394 (3d ed. 1963) ("noting that [incontestability] clauses came from the 'early greed and ruthlessness of the insurers' who 'too often . . . resisted liability stubbornly on the basis of some misstatement made by the insured at the time of applying for the policy' ").

Justice Holmes in an earlier opinion had stated succinctly the purpose behind the incontestability clause: "The object of the clause is plain and laudable — to create an absolute assurance of the benefit, as free as may be from any dispute of fact except the fact of death, and as soon as it reasonably can be done." *Northwestern Mut. Life Ins. Co.* v. *Johnson*, 254 U.S. 96, 101-102 (1920).

[16]In *Killian* v. *Metropolitan Life Ins. Co.*, 251 N.Y. 44, 49 (1929), Chief Judge Cardozo of the New York Court of Appeals explained why a Legislature might make that choice:

"The value of a clause declaring a policy incontestable lies to no slight degree in the definiteness of the protection accorded to the holder. The good that it promises is in part a state of mind. After the lapse of two years the insured is no longer to be harassed by the fear that the policy will be avoided by interested witnesses asserting in later days that there was a disclaimer long ago. After a like lapse the beneficiaries are no longer to be subjected to the risk of forfeiture through notices or warnings that may be hard to disprove when the insured is in his grave. Alike for insured and for beneficiaries, there is to be the peace of mind that is born of definiteness and certainty."

ate . . .").[17] We recognize that Sullivan's wilful concealment of his medical condition was deplorable and deserves condemnation. We do not pass judgment favorably or unfavorably on the balance that the Legislature has struck between the competing policy interests that underlay G. L. c. 175, § 132 (2). We simply conclude that the Legislature was within its province in striking such a balance in the first instance.

## III

The second question certified asks whether, if the incontestability statute bars rescission on the basis of fraud after two years, the incontestability period was equitably tolled under the circumstances of this case by Sullivan's failure to apply for the disability waiver to which he was entitled until two years after the policy was issued.

Protective Life contends that the incontestability period was tolled[18] in this case because Sullivan "concealed" his misrepresentations by delaying his application for a waiver of his premiums on account of his disability — a waiver to which he was entitled — for precisely two years, the same time period

---

[17]The commissioner suggests that there is a different policy reason — to protect consumers in Massachusetts through lower premiums — for permitting an insurer to rescind life insurance policies issued without a medical examination in the cases of wilful fraud. Widespread fraud, the commissioner says, could hinder one primary purpose of regulating the insurance industry, to ensure that adequate funds are available to pay consumers' claims, either because insurers will require medical examinations in every case or because insurers will be required to pay claims notwithstanding that policies were obtained on the basis of fraudulent misrepresentations. That argument finds no support in the legislative history of the enactment of G. L. c. 175, § 124. As we discussed earlier, that section was enacted in response to questionable business practices on behalf of insurers, and not because there was any evidence that consumers were engaged in fraud. While the commissioner may well view her interpretation as helping a primary purpose of regulating the insurance industry, we cannot say that this is what the Legislature intended.

[18]Protective Life apparently argued before the United States Court of Appeals for the First Circuit that the doctrine of equitable tolling should be applied to toll the incontestability period as a result of Sullivan's conduct. *Protective Life Ins. Co.* v. *Sullivan*, 89 F.3d 1, 4 (1st Cir. 1996). In its brief to this court, however, Protective Life no longer contends that this species of tolling applies to this case. Instead, Protective Life now claims that the "discovery rule" should be applied to toll the incontestability period here. For a discussion of the similarities and differences between "equitable tolling" and the "discovery rule," see *Wolin* v. *Smith Barney Inc.*, 83 F.3d 847, 851-853 (7th Cir. 1996).

beyond which the policy was incontestable. Dignity replies that G. L. c. 175, § 132, is more in the nature of a statute of repose than a statute of limitations, and that any tolling of the two-year period is inappropriate. Dignity further contends that, even if the incontestability statute can be tolled under some circumstances, Sullivan's delay in applying for a waiver of his premium on account of his disability does not warrant a tolling of the incontestability statute. Because we conclude that Sullivan's conduct (or rather absence of conduct) did not toll the running of the incontestability period, we need not — and do not — decide whether G. L. c. 175, § 132, is subject to tolling under any other circumstances.[19]

We begin by noting that the doctrine of equitable tolling is applicable only where the prospective plaintiff did not have, and could not have had with due diligence, the information essential to bringing suit. See *Wolin* v. *Smith Barney Inc.*, 83 F.3d 847, 852 (7th Cir. 1996). A party attempting to invoke that doctrine will be held to a duty of reasonable inquiry. *Id.* at 853. Here, Sullivan specifically authorized Protective Life to conduct whatever medical tests it desired, including a test for HIV infection. Had Protective Life exercised reasonable diligence, and had it not chosen to waive the authorized medical tests, it presumably would have discovered Sullivan's fraud.

Under the discovery rule, a statute of limitations[20] does not begin to run until the prospective plaintiff learns or should have learned that he has been injured. *Wolin, supra* at 852. The discovery rule operates to toll a limitations period only where a

---

[19]It is clear that if G. L. c. 175, § 132, is a statute of repose rather than a statute of limitations, it is not subject to any form of tolling. *Sullivan* v. *Iantosca*, 409 Mass. 796, 798 (1991). We previously have discussed the distinction between these two forms of statutes. See, e.g., *Klein* v. *Catalano*, 386 Mass. 701, 702 (1982). "A statute of limitations is a procedural measure which 'normally governs the time within which legal proceedings must be commenced . . . .' " *McGuinness* v. *Cotter*, 412 Mass. 617, 621 (1992), quoting *Klein, supra* at 702. "A statute of repose, on the other hand, 'completely eliminates a cause of action' after the time period established has run . . . ." *McGuinness, supra* at 622, quoting *Klein, supra* at 702. "The period in a statute of repose generally begins to run from some 'definitely established event'. . . ." *McGuinness, supra* at 622, quoting *Nissan Motor Corp.* v. *Commissioner of Revenue*, 407 Mass. 153, 158 (1990). The effect of a statute of repose is to "abolish" a cause of action even if it is not discovered until after the statute's time limit has expired. *McGuinness, supra* at 622.

[20]Again, we do not decide whether G. L. c. 175, § 132, is in the form of a statute of limitations or a statute of repose.

misrepresentation concerns a fact that was "inherently unknowable" to the aggrieved, *Friedman* v. *Jablonski*, 371 Mass. 482, 485 (1976), or where a wrongdoer concealed the existence of a cause of action through some affirmative act done with the intent to deceive, or breached some duty of disclosure. *Puritan Medical Ctr., Inc.* v. *Cashman*, 413 Mass. 167, 175 (1992). We cannot say that Protective Life's action for rescission is based on an "inherently unknowable" wrong on the part of Sullivan; through the exercise of reasonable inquiry, Protective Life could have learned of Sullivan's medical condition either before granting him the policy or within the two-year period.

Moreover, although the District Court found that Sullivan's delay in applying for a disability waiver of the premium amounted to an ongoing course of fraudulent conduct designed to conceal his fraud in the application, we do not believe that Sullivan's delay constitutes an "affirmative act" that warrants application of the discovery rule. Sullivan was under no obligation to file a claim for a disability waiver of his premium. The incontestability period cannot be tolled where, as here, the insured did not perform any affirmative acts to conceal the existence of his original fraud in the application. See *Puritan Medical Ctr., supra* at 175.

## IV

For the reasons stated, we answer the first question certified, "Yes," and the second question certified, "No." The Reporter of Decisions is to furnish attested copies of this opinion to the clerk of this court. The clerk in turn will transmit one copy, under the seal of this court, to the clerk of the United States Court of Appeals for the First Circuit, as answers to the questions certified, and will also transmit a copy to each party.

*So ordered.*