Hinkle, J.
Plaintiff Diane Joyce filed this action against her former employer, GF/Pilgrim, Inc. d/b/a The Guardian Center, alleging that she was terminated in retaliation for complaining about admission practices at the nursing home where she was employed as the Director of Nursing. This matter is before the court on defendant’s partial motion to dismiss Counts II, III and IV of the verified complaint under Mass.R.Civ.P. 12(b)(6) for failure to state a claim or, in the alternative, for summary judgment under Mass.R.Civ.P. 56. For the reasons discussed below, after a hearing, summary judgment is allowed as to Counts II, III and IV of the complaint.
*14 BACKGROUND
The following is taken from the summary judgment record. The undisputed facts, and any disputed facts viewed in the light most favorable to the non-moving party, are as follows. GF/Pilgrim is the owner and operator of a long-term care facility, commonly referred to as a nursing home, in Brockton, Massachusetts (“the Center”). In June of 1997, defendant hired plaintiff, a registered nurse, to be the Center’s Director of Nursing. Plaintiff did not have a written employment contract with the Center. Plaintiffs duties as Director of Nursing included patient care; management of the nursing staff, including scheduling and training; policy review, documentation audits; local, state and federal compliance review; and the management of internal quality programs.
On February 22, 2001, plaintiff signed an “Employee Acknowledgment Form” to acknowledge that she had received a copy of the Center’s “Human Resource Policy Book” (“the Handbook”). The Acknowledgment Form states in relevant part:
I have entered into my employment relationship with The Guardian Center voluntarily and acknowledge that there is no specific length of employment. Since the information, policies and benefits described here are necessarily subject to change, I acknowledge that the Guardian Center may revise the Handbook at any time. Furthermore, I acknowledge that this Handbook is neither a contract of employment nor a legal document. I have received this Handbook, and I understand that it is my responsibility to read and comply with the policies contained in this Handbook and any revisions made to it.
The preface to the Handbook states:
The statements in this Manual are operating guidelines. Flexibility in matters involving employment is critical to responding to the changing needs of the healthcare community, our facility and staff members. We do reserve the right to revise, supplement, discontinue or otherwise reconsider any or all of these policies, practices or employee benefits, with or without notice, at any time we deem it appropriate.
This manual is intended to describe important and useful information about your employment. No portion of the Manual constitutes a contract between you and the facility, or any of its employees, concerning any of the matters described herein.
The Handbook further provides:
All employment and compensation with the Guardian Center is “at will,” in that employment can be terminated with or without cause, and with or without notice, at any time, at the option of either the employer, or you the employee, except as otherwise provided by law.
The Handbook contains a section entitled “Progressive Discipline” which explains:
[w]hen a problem arises concerning employee performance, attendance or conduct deemed to be unsatisfactory, or has the potential of becoming unsatisfactory, it will be addressed by the immediate Supervisor according to the following protocol which will be dictated by the nature of the problem and not necessarily sequentially.
The Handbook then lists the following disciplinary options with brief descriptions: Employee Counseling, Written Record of an Oral Warning, Written Warning, Final Written Warning, Probation, Suspension and Termination. The Handbook further states in relevant part:
Termination — This is the step of last resort, where conduct or performance has simply not improved to an acceptable level, or when an employee commits an offense of such serious nature as to warrant immediate discharge . . .
Situations which can be cause for immediate discharge without advance warning include, but are not limited to the following:
Refusal or intentional failure to perform reasonable assigned work
Insubordination, willful or gross misconduct. . . Violation of safety rules . . .
EMPLOYMENT AT WILL
The Guardian Center has developed this Human Resource policy book in an effort to provide fair, equitable and consistent treatment of employees. However, all employees are hired as “employees at will.” This means that neither the employee nor the employer is bound by any contract — the employee may quit when s/he desires to, and likewise, the employer may terminate the employee at its discretion when it is deemed appropriate to do so.
In September of 2001, plaintiff verbally and in writing reported certain concerns about the Center’s patient admission practices to her direct supervisor, Jennifer Conley, the Administrator of the Center. Plaintiff informed Conley that Marie Albert, the Center’s Admissions Coordinator, was failing to obtain written patient consents to admission, treatment and medication from patients or their authorized representatives at the time of admission to the Center, in breach of 105 Code Mass.Regs. § 150.003.[1] In addition, plaintiff informed Conley that Albert was forging patient consents, backdating patient consent, and instructing the nursing staff to forge patient consents. Plaintiff opined that the treatment and medication of patients without written consents posed a risk to the patients’ health and safety and a risk to the professional licenses held by the Center and its staff. She also opined that billing federal and state entities such *15 as Medicare for patients who were being treated without consent constituted fraud because such patients technically were not admitted to the Center. Conley believed that plaintiffs complaints were prompted by her dislike for Albert.[2]
On December 18, 2001, plaintiff sent Conley an e-mail which stated in relevant part:
I mentioned to you yesterday that I had no intentions of quitting my job. I should not have to quit since I am simply attempting to relate to you the seriousness of numerous residents who were not legally admitted to the facility. I relayed this to you as my immediate superior and I expected you to follow up. Instead, I am working in an intensely hostile environment [sic] and I fear retaliation and wrongful termination of my job b/c I attempted to correct a wrong ... I told you on 5 separate occasions [sic] . . . that Marie had Betty Crowley and Paula Borges sign admission paper work with a check mark where the resident should have signed ... I directed each nurse they are not to obtain any signatures from residents for admission paper work until further notice because they are receiving inaccurate [sic] information and being asked to sign documents which jeopardizes [sic] their licensure, as well as mine and yours. Until [sic] the process is revised and legal, I feel the staff nurses should not be expected to involve themselves [sic] in knowingly illegal activity since they are not knowledgeable [sic] about all the admission regs . . .
The following day, plaintiff sent Conley another e-mail which stated in relevant part:
I have contacted an attorney who has advised me to receive a signed confirmation from you that you received my email dated 12/18/01 . . . The email on 12/18/01 discussed my complaint to you going back to 9/14/01 . . . about Marie Albert asking two nurses to use check marks in the section the resident actually should have signed. Also I reiterated the numerous current and discharged residents who never received the resident rights nor consent to treat and admit. The reason for the confirmation from you is due to my concern about illegal practices taking place and my and the other nurse’s complicicity [sic] in the illegal practices. As my superior I want confirmation that you will handle this complaint and I could stop worrying and complaining.
On December 21, 2001, Conley informed plaintiff that she was instituting a new administrative policy requiring the Nursing Department to obtain the necessary written consent from each patient upon admission to the Center. Before this policy, the Admissions Department was responsible for obtaining such consent. Plaintiff strongly disagreed with the new policy, partly because she felt that Albert should not be excused from her duly to obtain consent forms. On December 24, plaintiff sent Conley an e-mail stating in relevant part:
you stated you were now making it policy that the admission consent will be transferred from the Admission Director and now will be the sole responsibility of the nursing department. I ask you to reconsider this policy prior to informing the nurses of this. You suggested that Marie could not be expected to be at work at all hours of the day to admit residents. The required workload for the nurses is overwhelming to expect them to leave at the end of their scheduled shift ... I know you stated other nursing homes have nurses obtaining the admission consent on off shifts however, this is a rarity and I have never seen it done in a single home. There again, I have never seen the admission process problematic in any home I have ever worked in. It is unrealistic to ask the nurses to perform another task and assume another duly just because the current process is flawed . . .
If you need additional verification that the nurse’s workload is already excessive and unsafe I ask that you join them for a 7-3 shift and 3-11 shift. (Different days of course). Simply observe what takes place on an average shift without the additional responsibility of an admission and I believe you will be shocked . . .
You asked me last week what I consider to be harassment? I feel your change in policy to now have the nurses obtain the consents from residents is pay back, and retaliation to my complaint. . .
On December 28, 2001, plaintiff sent a written memo to the nursing staff telling them not to treat any patients unless there was a written consent form but did not mention that the policy was going to change to require nurses to obtain the consents.
On January 2, 2002, plaintiff reported what she believed were improper admissions practices to Eleanor Robinson, the Center’s Compliance Officer. On January 7, plaintiff notified Conley in writing that she had been receiving telephone “hang up” calls which she suspected were being made from Center telephones and that she was concerned for her safety. The same day, Conley terminated plaintiffs employment due to insubordination. In her deposition, Conley explained that there was a history of personality conflict between plaintiff and Albert and that she believed that plaintiffs complaints concerning admissions practices were an attempt to get Albert fired. Conley further believed that plaintiffs conduct was dividing the nursing staff and creating conflict in the work environment and that plaintiff was insubordinate in instructing the nurses not to comply with the new admissions policy.
Thereafter, on January 31, 2002, plaintiff filed this action. Count I of the complaint alleges violation of the “healthcare whistle-blower” statute, G.L.c. 149, §187; *16 Count II alleges termination of employment in violation of public policy; Count III alleges breach of the implied covenant of good faith and fair dealing; and Count IV alleges breach of implied contract.
DISCUSSION
Summary judgment shall be granted where there are no genuine issues as to any material fact and where the moving party is entitled to judgment as a matter of law. Mass.R.Civ.P. 56(c); Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983); Community Nat’l Bank v. Dawes, 369 Mass. 550, 553 (1976). The moving party bears the burden of affirmatively demonstrating the absence of a triable issue and that the summary judgment record entitles the moving party to judgment as a matter of law. Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989). The moving party may satisfy this burden either by submitting affirmative evidence that negates an essential element of the opposing party’s case or by demonstrating that the opposing party has no reasonable expectation of proving an essential element of his case at trial. Flesner v. Technical Communications Corp., 410 Mass. 805, 809 (1991); Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991).
I. Preemptive Effect of Whistleblower Statute
Defendant initially first moves for summary judgment on Counts II, III and IV of the complaint on the ground that the healthcare whistle-blower statute, G.L. 149, §187 (“the Act”), preempts all common-law claims. The Act provides in relevant part:
(b) A health care facility[3] shall not refuse to hire, terminate a contractual agreement with or take any retaliatory action against a health care provider[4] because the health care provider does any of the following:
(1)discloses or threatens to disclose to a manager or to a public body an activity, policy or practice of the health care facility . . . that the health care provider reasonably believes is in violation of a law or rule or regulation promulgated pursuant to law or violation of professional standards of practice which the health care provider reasonably believes poses a risk to public health;
(3) objects to or refuses to participate in any activity, policy or practice of the health care facility . . . which the health care provider reasonably believes is in violation of a law or rule or regulation promulgated pursuant to law or violation of professional standards of practice which the health care provider reasonably believes poses a risk to public health . . .
G.L.c. 149, § 187(b) (1999). The Act then provides health care providers with a cause of action as follows:
(d) Any health care provider or former health care provider aggrieved by a violation of this section may, within two years, institute a civil action in the superior court. Any party to such action shall be entitled to claim a juiy trial. All remedies available in common-law tort actions shall be available to prevailing plaintiffs. The remedies shall be in addition to any legal or equitable relief provided herein. The court may:
(1) issue a temporary restraining order or preliminary or permanent injunction to restrain continued violation of this section;
(2) reinstate the health care provider to the same position held before the retaliatory action, or to an equivalent position;
(3) reinstate full fringe benefits and seniority rights to the health care provider;
(4) compensate the health care provider for lost wages, benefits and other remuneration, and interest thereon; and
(5) order payment by the health care facility of reasonable litigation costs, reasonable expert witness fees and reasonable attorneys fees . . .
Finally, the Act provides:
(g) Nothing in this section shall be deemed to diminish the rights, privileges or remedies of any health care provider under any other federal or state law or regulation or under any collective bargaining agreement or employment contract.
G.L.c. 149, § 187(g) (1999).
Plaintiff contends that although § 187(g) preserves any additional statutory, regulatory or contract claims a health care provider may have against an employer, its silence as to the preservation of common-law claims dictates that such claims are preempted. Plaintiff relies on the maxim of statutory construction that the expression of one thing is the exclusion of the other. See Protective Life Ins. Co. v. Sullivan, 425 Mass. 615, 620 (1997); Collatus v. Boston Retirement Bd., 396 Mass. 684, 687 (1986). The language of §187(g) cited by plaintiff is identical to language contained in the public employee whistle-blower statute, G.L.c. 149, §185. However, Section 185(f) of the public employee statute expressly provides:
Nothing in this section shall be deemed to diminish the rights, privileges or remedies of any employee under any other federal or state law or regulation or under any collective bargaining agreement or employment contract; except that the institution of a private action in accordance with subsection (d) shall be deemed a waiver by the plaintiff of the rights and remedies available to him, for the actions of the employer, imder any other contract, collective bargaining agreement, state law, rule or regulation, or under the common law.
G.L.c. 149, §185(f) (1997) (emphasis added). In enacting this waiver provision, the Legislature intended to prevent an employee from receiving a duplicative or cumulative recovery based on a public employer’s retaliatory action. Haddad v. Scanlon, 1999 *17 Mass.Super. LEXIS 272 at *9, 10 Mass. L. Rptr. 298 (July 16, 1999) (Welch, J.).
In contrast to G.L.c. 149, §185(f), the Act does not contain a waiver provision or other language suggesting preemption of common-law remedies. When the Legislature has intended to make a statutory remedy exclusive, it has used very specific language to do so. See, for example, Section 24 of the Workers’ Compensation Act,[5] Section 9 of the Unlawful Discrimination in Employment Act,[6] and Section 2 of the Massachusetts Tort Claims Act.[7] See also Green v. Wyman-Gordon Co., 422 Mass. 551, 557-58 (1996) (employee’s common-law claims based on workplace sexual harassment preempted by exclusivity provisions of Chapter 151B and Chapter 152). Absent a clear indication by the Legislature that it intended the statutory remedy in G.L.c. 149, §187 to be exclusive, this Court declines to rule that the Act preempts all common-law claims by a health care provider based on retaliatory conduct falling within the scope of the statute.
II. Count II: Termination in Violation of Public Policy
Plaintiff contends that even if the statutory remedy in G.L.c. 149, §187 is not exclusive, plaintiff cannot, as a matter of law, state a common-law claim for termination in violation of public policy. The general rule is that employment at will is terminable by the employer without notice, for almost any reason or for no reason at all. Wright v. Shriners Hosp. for Crippled Children, 412 Mass. 469, 472 (1992); Jackson v. Action for Boston Community Development, Inc., 403 Mass. 8, 9 (1988). However, an at-will employee has a cause of action for wrongful termination where her termination violates a clearly established public policy, as where she is terminated for asserting a legally guaranteed right, for doing what the law requires, or for refusing to do that which the law forbids. King v. Driscoll, 418 Mass. 576, 582 (1994); Wright v. Shriners Hosp. for Crippled Children, 412 Mass, at 472. The rationale for the public policy exception to the traditional rule governing at-will employment is that, unless such a common-law remedy is recognized, there is no other way to vindicate public policy. Melley v. Gillette Corp., 19 Mass.App.Ct, 511, 512 (1985), aff'd, 397 Mass. 1004 (1986). Thus, where a comprehensive remedial statute protects the public policy at issue, a terminated employee does not have a common-law action for termination in violation of that public policy. Mello v. Stop & Shop Cos., 402 Mass. 555, 557 (1988). See, e.g., Federici v. Mansfield Credit Union, 399 Mass. 592, 597 (1987) (no common-law claim for termination based on work-related injury where G.L.c. 152, §75A provides rights and remedy); Melley v. Gillette Corp., 19 Mass.App.Ct. at 513 (no common-law claim for age-based termination given existence of Chapter 151B); Lohnes v. Darwin Partners, Inc., 15 Mass. L. Rptr. 157 (July 23, 2002) (Gants, J.) (no common-law claim for termination in retaliation for complaint about failure to pay wages and commissions where G.L.c. 149, §150 provided remedy).
Here, plaintiff alleges she was terminated because she complained of illegal admission practices at the Center, practices which violated 105 Code Mass.Regs. §150.003 and threatened the health and safety of nursing home residents. Such a termination clearly falls within the protection of G.L.c. 149, §187(b) which protects health care providers such as registered nurses against retaliation for “disclosing] ... to a manager... an activity, policy or practice of the health care facility . . . that the health care provider reasonably believes is in violation of a law or rule or regulation promulgated pursuant to law.” Because the Act provides a comprehensive remedial scheme to vindicate the public policy of protecting health care workers who report illegal conduct, I find and rule that plaintiff has no common-law claim for termination in violation of that public policy. See Mello v. Stop & Shop Cos., 402 Mass, at 557. Cf. Hobson v. McLean Hosp. Corp., 402 Mass. 413, 416 (1988) (before enactment of G.L.c. 149, §187, nurse stated claim for termination in violation of public policy where she was fired from hospital for enforcing state and local laws concerning supervision of patients). Thus, defendant is entitled to summary judgment on Count II of the complaint.
III. Count III: Breach of Covenant of Good Faith & Fair Dealing
Defendant further contends that as a matter of law, plaintiff fails to state a claim for breach of the covenant of good faith and fair dealing. In Massachusetts, eveiy contract contains an implied covenant of good faith and fair dealing that neither party will do anything to deprive the other of the fruits of the contract. Harrison v. NetCentric Corp., 433 Mass. 465, 473 (2001). An employer violates the covenant of good faith and fair dealing where it terminates an at-will employee in order to deprive her of commissions or other compensation already earned. King v. Driscoll, 424 Mass. 1, 6 (1996); Fortune v. National Cash Register Co., 373 Mass. 96, 104-05 (1977). Plaintiff does not argue that her termination falls into this analytical framework.
Other case law suggests that termination of an at-will employee for reasons contrary to a well-defined policy constitutes a breach of the covenant of good faith and fair dealing. See Fairneny v. Savogran Co., 422 Mass. 469, 475 (1996); Federici v. Mansfield Credit Union, 399 Mass, at 595. However, a cause of action for breach of the implied covenant exists only when there is no other adequate way to vindicate public policy. Grubba v. Bay State Abrasives, 803 F.2d 746, 747 (1st Cir. 1986); Bhawan v. Fallon Clinic, Inc., 5 F.Sup.2d 64, 67 (D.Mass. 1998). Given the comprehensive remedy set forth in G.L.c. 149, §187, I find and rule that plaintiff does not have an action for breach of the implied covenant of good faith and fair dealing based on a violation of public policy. Therefore, defen *18 dant is entitled to summary judgment on Count III of the complaint.
IV. Count IV: Breach of Implied Contract
Finally, defendant contends that plaintiff has no reasonable expectation at trial of demonstrating breach of an implied contract. In some circumstances, a personnel manual distributed by an employer to its employees may form the basis of an implied employment contract. O’Brien v. New England Tel. & Tel Co., 422 Mass. 686, 691 (1996). The central inquiry is whether in light of the context of the manual’s preparation and distribution, as well as its specific provisions, it would be objectively reasonable for employees to regard the manual as a legally enforceable commitment concerning terms and conditions of employment. Weber v. Community Teamwork, Inc., 434 Mass. 761, 779 (2001); Ferguson v. Host International, Inc., 53 Mass.App.Ct. 96, 102 (2001).
No specific list of prerequisites determines whether a personnel manual constitutes an implied contract; all relevant facts and circumstances must be considered. O’Brien v. New England Tel. & Tel. Co., 422 Mass, at 692. For example, while the fact that the employer and employee negotiated concerning the terms of a manual justifies a finding of implied contract, negotiation is not an essential precondition to enforcement of a manual. In addition, disclaimer clauses stating that a manual creates no contractual rights or reserving a unilateral right to modify or cancel the manual, while relevant, are not dispositive of whether an employee could reasonably believe that procedures contained therein bind management. Id. at 692-93; Ferguson v. Host International, Inc., 53 Mass.App.Ct. at 103. Other relevant factors include whether the manual provides merely general guidance or sets forth employee rights and mandatory responsibilities in great detail; whether the employee signed the manual, manifested assent to it or acknowledged understanding of its terms, and whether the employer called special attention to the manual. Weber v. Community Teamwork, Inc., 434 Mass, at 780; O’Brien v. New England Tel. & Tel Co., 422 Mass, at 693. Also, evidence that management had a practice of adhering to a manual’s procedures supports a finding of an implied contract. O’Brien v. New England Tel. & Tel. Co., 422 Mass, at 694; Jackson v. Action for Boston Community Development, Inc., 403 Mass, at 14.
Here, the summary judgment record reveals that defendant provided the Handbook to plaintiff in February of 2001. By signing it, plaintiff acknowledged its receipt, that she was responsible for complying with its terms, and that it was neither a contract of employment nor a legal document guaranteeing a specific length of employment. Plaintiff apparently complied with the Handbook’s procedures in reporting the allegedly improper admissions practices. The preface to the Handbook, its first page, states that the Handbook is not a contract of employment and that plaintiff reserves the right to revise or discontinue the policies, practices and benefits in the Handbook, without notice and at any time.
The fourth page of the Handbook contains a section entitled “At Will Employment” which reiterates that an employee may be terminated without cause and withoutnotice at any time. Overall, the Handbook provides more than general guidance as to policies and contains specific responsibilities expected of employees as well as eligibility for certain benefits. Specifically cited by plaintiff, the Handbook provides for “Progressive Discipline” and states that problems will be addressed by supervisors “according to the following protocol which will be dictated by the nature of the problem and not necessarily sequentially.” Immediately following the listing of various options for progressive discipline, the Handbook sets forth situations warranting immediate discharge without warning and then reiterates that all employees are employees at-will who may be terminated at the discretion of plaintiff.
Consideration of all the relevant factors in the summary judgment record reveals that the issue of whether plaintiff meets the Kourouvacilis standard on Count IV is a close call. Defendant called attention to the Handbook and required employees to sign an acknowledgment that they would comply with its terms. As noted, the Handbook contains more than general guidance, setting forth specific obligations, benefits and procedures. See O’Brien v. New England Tel. & Tel. Co., 422 Mass, at 693-94 (manual binding contract where although it was not negotiated it contained no disclaimer that employer could unilaterally change it or fire employees without cause, it provided more than general guidance as to employer’s policies, and employer regularly followed manual’s procedures in addressing employee grievances).
Conversely, the Handbook’s numerous and prominent disclaimers that it does not provide contractual rights or alter employees’ at-will status, as well as the fact that supervisors appear to retain some discretion in implementing the progressive discipline, suggest that it might not be reasonable for employees to view the Handbook’s procedures as binding on management. See Hinchey v. Nynex Corp., 144 F.3d 134, 141-42 (1st Cir. 1998); Chilson v. Polo Ralph Lauren Retail Corp., 11 F.Sup.2d 153, 157 (D.Mass. 1998) (handbook not binding contract where there was no negotiation; employer retained right to modify it unilaterally; handbook in bold print repeatedly emphasized it was not binding contract; handbook stated that employee participation in its procedures was voluntary and stated that employer retained right to fire employee any time without cause).
Here, in light of the fact that plaintiff signed an acknowledgment that the Handbook was neither a contract of employment nor a legal document, I conclude that no reasonable jury could find that she was justified in regarding the Handbook as a legally en *19 forceable, binding commitment concerning the terms and conditions other employment. Accordingly, defendant is entitled to judgment as a matter of law on Count IV of the complaint.
ORDER
For the foregoing reasons, it is hereby ORDERED that defendant’s partial motion for summary judgment is ALLOWED as to Counts II, III and IV of the verified complaint.

 That regulation provides: “No facility shall admit a patient or resident without written consent of the individual (if she/he is competent to enter into such an agreement) or her/his parent or legal guardian (if she/he is not) except in emergencies:” 105 Code Mass.Regs. §150.003(B)(2).

 At deposition, plaintiff admitted that she hated Albert and that she and Albert had “screaming matches” over various personal and professional disagreements.

 The statutory definition of “health care faciliiy” includes nursing homes. See G.L.c. 149, §187(a) (1999).

 The statutory definition of “health care provider” includes a registered nurse. See G.L.c. 149, §187(a) (1999).

 Section 24 of Chapter 152 provides in relevant part: “An employee shall be held to have waived his right of action at common law or under the law of any other jurisdiction in respect to an injury that is compensable under this chapter, to recover damages for personal injuries, if he shall not have given his employer, at the time of his contract of hire, written notice that he claimed such right.. .” G.L.c. 152, §24 (2000).

 Section 9 of Chapter 151B provides in relevant part: “nothing contained in this chapter shall be deemed to repeal any provision of any other law in this commonwealth relating to discrimination; but, as to acts declared unlawful by section 4, the administrative procedure provided in this chapter under section 5 shall, while pending, be exclusive; and the final determination on the merits shall exclude any other civil action, based on the same grievance of the individual concerned.” G.L.c. 151B, §9 (2002).

 Section 2 of Chapter 258 provides in relevant part: “(t]he remedies provided by this chapter shall be exclusive of any other civil action or proceeding by reason of the same subject matter against the public employer or, the public employee or his estate whose negligent or wrongful act or omission while acting within the scope of his office or employment...” G.L.c. 258, §2 (2000).