## Ruth Robinson *vs.* Prudential Insurance Company of America & another.[1]

No. 00-P-374.

Middlesex. March 7, 2002. - October 11, 2002.

Present: Brown, Dreben, & Doerfer, JJ.

*Insurance,* Life insurance, Fraud and concealment, Misrepresentation. *Statute,* Construction. *Consumer Protection Act,* Insurance. *Words,* "Medical examination."

Discussion of the burden of proof placed on an insurer under G. L. c. 175, § 186, when it contests a life insurance policy issued with a medical examination, and the higher burden of proof placed on an insurer under G. L. c. 175, § 124, when it contests a life insurance policy issued "without previous medical examination." [246]

This court concluded that the term "medical examination," as it is used in G. L. c. 175, § 124, means an examination by a physician [248-251]; thus, where a life insurance policy was issued after an examination by a registered nurse only, the judge in a civil action to recover benefits under the policy erred in granting summary judgment to the insurer, which had the burden of proving, as required by G. L. c. 175, § 124, that any misrepresentations made by the insured in applying for the policy were "wilfully false, fraudulent or misleading" [251-252].

In an action brought by a widow against an insurer and its sales agent to recover death benefits under a life insurance policy issued to the widow's husband, the trial judge properly granted summary judgment in favor of the sales agent, where the agent's negligence, if any, in failing to inform the insurer of the insured's medical history would have had no effect on the plaintiff's recovery from the insurer and would not have caused the plaintiff any damage. [252]

A plaintiff seeking recovery under a life insurance policy could not maintain a G. L. c. 93A claim against the insurer, where the insurer's action in contesting the policy was reasonable. [252]

Civil action commenced in the Superior Court Department on January 22, 1999.

The case was heard by *Elizabeth M. Fahey,* J., on a motion for summary judgment.

[1]Louis Pumphrey.

*David W. Krumsiek* for the plaintiff.

*Edward P. O'Leary* for the defendants.

DREBEN, J. This is an action by a widow against an insurer and its sales agent to recover death benefits under a life insurance policy issued to the widow's husband, Russell Robinson (Russell). The insurer, Prudential Insurance Company of America (Prudential), declined to pay the benefits, claiming that Russell had misrepresented the state of his health in applying for the policy. A judge of the Superior Court granted summary judgment for the defendants. Whether that grant was proper depends in large part on which of two sections of G. L. c. 175 applies, § 124 or § 186, and that, in turn, depends on whether the policy issued "without previous medical examination." The two sections are set forth in the margin.[2] We hold that the term "medical examination" contained in § 124 refers to an examination by a physician and does not include an examination by a nurse, and that the question whether the insured's statements were "wilfully false, fraudulent or misleading," as required by § 124, presents a jury issue. Accordingly, we reverse the judgment for the insurer.

We first set forth the legal significance of a medical examination and then describe the facts, viewed in the light most favorable to the nonmoving party. *Sullivan* v. *Brookline*, 435 Mass. 353, 356 (2001).

---

[2]General Laws c. 175, § 124, in relevant part, provides:

"In any claim arising under a policy issued in the commonwealth by any life company, without previous medical examination . . . the statements made in the application as to the age, physical condition and family history of the insured shall be held to be valid and binding on the company; but the company shall not be debarred from proving as a defense to such claim that said statements were wilfully false, fraudulent or misleading."

General Laws c. 175, § 186, provides:

"No oral or written misrepresentation or warranty made in the negotiation of a policy of insurance by the insured or in his behalf shall be deemed material or defeat or avoid the policy or prevent its attaching unless such misrepresentation or warranty is made with actual intent to deceive, or unless the matter misrepresented or made a warranty increased the risk of loss."

1. *Significance of "medical examination."* The importance of determining whether the examination of Russell by a nurse was a "medical" one within the meaning of G. L. c. 175, § 124, is explained in *Protective Life Ins. Co.* v. *Sullivan*, 425 Mass. 615, 623 (1997), and in *Torres* v. *Fidelity & Guar. Life Ins. Co.*, 34 Mass. App. Ct. 376, 377-380 (1993). As seen from its legislative history, the purpose of § 124 is to impose a higher burden of proof on an insurer when it contests a life insurance policy issued without a medical examination than when it contests a life insurance policy issued after a medical examination. *Protective Life Ins. Co.* v. *Sullivan*, 425 Mass. at 623. If there is an examination, § 186 applies, and an insurer need only show that the misrepresentation was made with an "actual intent to deceive" or that the misrepresentation "increased the risk of loss." If a policy is issued without a medical examination, the insurer must show that the "statements were wilfully false, fraudulent or misleading." G. L. c. 175, § 124.

2. *Factual material submitted by the parties.* According to the plaintiff's affidavit, Louis Pumphrey, an insurance agent employed by the defendant, met with the plaintiff and Russell in November, 1997, in order to sell them a life insurance policy. Pumphrey asked Russell a series of questions about his health and medical history. In response, Russell told Pumphrey that he had high blood pressure and that he had suffered a stroke that had led to his hospitalization ten years earlier. Pumphrey returned several days later, met again with the plaintiff and Russell, and informed them that Russell need not submit to a medical examination but would have to give a urine sample and have his blood pressure tested.

Subsequently, in early December, a registered nurse, Elaine Whitman, came to their house, took Russell's blood pressure and collected a urine sample. A week later, they received a letter from Pumphrey confirming life insurance coverage in the amount of $60,000. Pumphrey again met with the couple on January 8, 1998, handed Russell a typewritten application, and advised him that it had been completed in accordance with the information Russell had provided during the first meeting. Pumphrey instructed Russell to sign his name where indicated on the final page of the application, and Russell did so without

fully reading the application. Russell died due to massive heart failure on April 3, 1998.

The insurance company supported its motion for summary judgment with affidavits stating that the responsibility for interviewing clients concerning their medical history lies with Prudential underwriters, rather than with agents. It is the underwriters who call clients on the telephone, ask medical questions, and determine whether medical examinations are necessary. On December 3, 1997, Prudential underwriter Vicky Fesmire spoke to Russell by telephone, asked him questions, and entered his answers on the application part of the insurance policy.

Since Russell had died during the two-year period before the policy had become incontestible, see G. L. c. 175, § 132, the insurer conducted an investigation after Russell's death. Several answers on the application turned out to be incorrect and, had the insurer had the correct information, a higher premium would have been charged. The most important errors were negative answers to the following questions:

> "(4) Has anyone proposed for coverage had:
>
> "a. chest pain, or any disorder of the heart or blood vessels? . . .
>
> "h. any disorder of the brain or nervous system?"[3]

The application prepared by Fesmire reflected Russell's disclosure to her of his high blood pressure and contained details as to when it had been diagnosed and what had been prescribed.

Fesmire's affidavit states that because of Russell's age and the amount of the policy a medical examination was required. The policy, however, states that no medical examination is required. Fesmire claims this was a "typographical error," and that Elaine Whitman, a registered nurse, performed the medical examination at the request of Prudential.

---

[3]Another negative answer failed to reveal that Russell had been hospitalized for surgery for bilateral inguinal hernias. The application also contained a catchall question, also answered in the negative, which asked whether anyone proposed for coverage had "any disease, disorder or condition not indicated above."

3. *Examination by Nurse Whitman.* The form filled out by Whitman, entitled "Modified Examination Form,"[4] consists of two pages: the first page contains (1) the name and social security number of the insured; (2) the name and date of birth of the person to be examined; (3) the name, social security number, address, and tax number of the examiner; (4) the date of the examination, amount of insurance, and name of the agent; and (5) a fee section to be completed by the examining physician relating to the services provided.[5] The first page was filled out, except for the fee section.

Whitman completed a portion of the second page of the modified examination form: where and when the examination was done (at home at 6:00 P.M.); the current age or age at death; and year and cause of death of the insured's family members (father, mother, brothers, sisters). The only physical examination performed by Whitman was measuring the insured's weight and height, taking two readings of the insured's blood pressure, and taking a single reading of the insured's pulse rate per minute. She wrote that she had mailed a urine sample and that there was no albumin or sugar in the insured's urine. With a checkmark, she noted that Russell was not her patient and that she had no information regarding any physical or mental impairment that Russell might have. She left blank the parts of the form that asked whether there were any abnormalities of the eyes, blood vessels, respiratory organs, abdominal organs, or nervous system. Also left blank was a section instructing the examiner to "[e]xamine heart in upright, recumbent and [illegible] lateral recumbent positions" and asking whether there. were "murmurs." Whitman signed the second page of the form.

4. *"Medical examination" within meaning of § 124.* The motion judge concluded, we think correctly, that the examination

---

[4]Prudential indicated that it had another form which was similar but asked more medical history questions.

[5]The section reads "Fee — Please indicate your fee for the service(s) provided:

| "Exam | $____ | ECG | $____ |
| Lab | $____ | X-Ray | $____ |
| | | Total | $____ " |

performed by Whitman was not a medical examination within the meaning of § 124. "[I]n construing a statute, words are to be accorded their ordinary meaning and approved usage." *Commonwealth* v.. *Anderson*, 38 Mass. App. Ct. 707, 711 (1995). Ballantine's Law Dictionary 787-788 (3d ed. 1969), defines "medical examination" in relevant part as follows:[6]

> "An examination of a person by a physician for the purpose of giving medical treatment or medical advice. An examination by a physician to determine the state of health of the person examined, apropos the need for medical or surgical treatment or his acceptability as a life insurance risk. An examination by a physician to determine whether or not a person has a communicable disease. An examination to determine the existence of venereal disease" (citations omitted).

In *St. Cloud Natl. Bank & Trust Co.* v. *Woodmen of the World Life Ins. Soc.*, 451 N.W.2d 75, 79 (Minn. App. 1990), the court construed a similar statute,[7] and held that a referral of the insured by the insurer to a nurse for a "paramedical examination" was not a "medical examination." In that case, the procedure consisted of the nurse checking the applicant's pulse and blood pressure, performing a limited urinalysis and asking him or her a list of medical history questions provided by the insurer. There was no supervision by a medical doctor, nor was the nurse's report evaluated by a physician.

While the insurer in *St. Cloud* characterized the examination as a "paramedical" one, we do not consider that fact dispositive. In the present case, Prudential also did not call the examination a "medical" one on its forms, and the only reference in the form to the qualification of the examiner is to a physician. The fee portion states, "To be completed by examining physician." See note 5, *supra*. As in *St. Cloud*, the examination was a

---

[6]We have not found a definition of the phrase "medical examination" in the Black, Webster or American Heritage dictionaries.

[7]Minnesota Stat. § 61A.11 (1988), as quoted in the opinion, states: "In any claim upon a policy issued in this state without previous medical examination . . . the statements made in the application as to the age, physical condition, and family history of the insured shall be valid and binding upon the company, unless willfully false or intentionally misleading."

limited one, covered only part of the physical component of the examination requested by the form, and was not supervised or evaluated by a physician. Cf. *Braxton* v. *Unity Industrial Life Ins. Co.*, 14 La. App. 435, 437 (1930). But see *Parchman* v. *United Liberty Life Ins. Co.*, 640 S.W.2d, 694, 695, 698 (Tex. App. 1982) (indicating, in another context, that examination by a nurse was a medical examination).

Our conclusion that the term "medical examination" in the statute means examination by a physician is also buttressed by other statutes, set forth in the margin,[8] which were passed shortly before or after c. 175, § 124, was first enacted by St. 1892, c. 372. These statutes invariably refer to physicians or registered medical practitioners (who were then considered qualified physicians, see note 8, *supra*) in the context of medical examinations and strongly suggest that the Legislature considered medical examinations to be examinations conducted

[8]Statute 1884, c. 235, a predecessor to current G. L. c. 175, § 122, was enacted in order to prevent discrimination by life insurance companies against persons of color. That act provided that no distinction should be made between white persons and "colored persons wholly or partially of African descent." *Id.* at § 1. It also required that "[a]ny . . . company which shall refuse the application of any such colored person for insurance upon such person's life, shall furnish such person with the certificate of some regular examining physician of such company who has made examination of such person stating that such person's application has been refused not because such person is a person of color, but solely upon such grounds of the general health and hope of longevity of such person as would be applicable to white persons of the same age and sex." *Id.* at § 2. Present G. L. c. 175, § 122, still provides that if a company refuses an application of a "colored person," the company "shall furnish such person, on his request therefor, with the certificate of a regular examining physician of such company who made the examination stating" that such refusal was not because the applicant was a "person of color" but because of health.

In 1894, the first provision for registration of physicians, St. 1894, c. 458, was passed and provided in § 3 that "every . . . person who is a graduate of a legally chartered medical college or university . . . and every person who has been a practitioner of medicine in this Commonwealth continuously for a period of three years next prior to the passage hereof shall . . . be entitled to registration." These persons were to receive certificates as qualified physicians. See St. 1894, c. 458, §§ 3, 4.

In 1895, St. 1895, c. 366, § 1, was enacted to prohibit the issuance of a life insurance policy "without having previously made or caused to be made a prescribed medical examination of the insured by a registered medical practitioner." That provision was subsequently repealed. See St. 1952, c. 14.

by physicians. While we recognize that nurses and nurse practitioners now assume many of the duties of physicians, and at less cost, if the term "medical examination" in § 124 is to be interpreted contrary to both its original meaning and its ordinary lexical definition, the change should be made by the Legislature. Accordingly, we construe "medical examination" as used in § 124 to mean an examination by a physician.

5. *Issues for a jury.* The motion judge, although construing the statute to require an examination by a physician, determined that the statements were "wilfully false, fraudulent or misleading" based on the presumption that a person signing a written instrument knows its contents. She also relied on language contained in *Sullivan* v. *Manhattan Life Ins. Co. of New York*, 626 F.2d 1080, 1082 (1st Cir. 1980) (which interpreted § 186, not § 124). While Russell twice signed the policy and thereby twice certified that the statements were true,[9] in view of the purpose of § 124 to increase the burden on insurers where no medical examination is had, see *Protective Life Ins. Co.* v. *Sullivan*, 425 Mass. at 623, and *Torres* v. *Fidelity & Guar. Life Ins. Co.*, 34 Mass. App. Ct. at 380, the question whether the defendant insurer has met its burden of proving the statements "wilfully false, fraudulent or misleading" is not to be determined on summary judgment. As stated in *Sullivan* v. *John Hancock Mut. Life Ins. Co.*, 342 Mass. 649, 655-656 (1961), quoting from *Rappe* v. *Metropolitan Life Ins. Co.*, 322 Mass. 438, 440 (1948), with reference to § 186, where a lesser burden applies: "An incorrect statement does not necessarily indicate actual intent to deceive." A fortiori, the same holds true for the higher burden imposed by § 124.

If, as alleged, Russell informed Pumphrey of his stroke and if the circumstances of the signing were as alleged by the plaintiff,

[9]The application was signed in two places by Russell, once after the background section (occupation, sports, information concerning his driver's license), and again after the medical history section. Preceding the first signature is the following statement: "I certify that to the best of my knowledge and belief the statements in this application are complete, true and correctly recorded." Preceding the second signature, the following language appears: "All the answers are, to the best of my knowledge and belief, complete, true and correctly recorded. It is understood that any new coverage could be invalidated if any information in the application is materially misrepresented."

it can not be decided as matter of law that the incorrect statements on the policy were "wilfully false, fraudulent or misleading." This is a jury question. See *id.* at 656.

6. *Action against Pumphrey.* The judgment in favor of Pumphrey is affirmed. If it is determined that Russell was wilfully false in his statements, the plaintiff will not be entitled to recover from the insurer; if he was not, she will obtain the proceeds of the policy. Prudential is bound by the knowledge received by Pumphrey who, it is undisputed, was Prudential's agent and, it appears, had at least apparent authority to receive these statements. See *Sullivan* v. *John Hancock Mut. Life Ins. Co., supra* at 654-655. For this reason Pumphrey's negligence, if any, in failing to inform Prudential of Russell's stroke, assuming he was told of it by Russell, would have no effect on the plaintiff's recovery from Prudential. Pumphrey's failure, if any, would thus not have caused the plaintiff any damage.

7. *Chapter 93A claim.* The plaintiff's G. L. c. 93A claim is without merit, as Prudential's action in contesting the policy was not unreasonable. See *Guity* v. *Commerce Ins. Co.,* 36 Mass. App. Ct. 339, 343 (1994). See also *Van Dyke* v. *St Paul Fire & Marine Ins. Co.,* 388 Mass. 671, 677 (1983).

The judgment is reversed and the case is remanded to the Superior Court for further proceedings on the plaintiff's claim against Prudential to recover on the policy. The Superior Court is directed to enter orders dismissing the plaintiff's G. L. c. 93A claim against Prudential and all claims against Pumphrey.

*So ordered.*