Gants, Ralph D., J.
The plaintiff Pauli Hejinian (“Hejinian”) was married to Charlotte Ellertson (“Ellertson”), who died of cancer on March 21, 2004. At the time of her death, Ellertson had a $1,000,000 life insurance policy with the defendant General American Life Insurance Company (“General American”), with Hejinian as her beneficiary (“the Policy”). On July 13, 2004, Hejinian filed a claim for death benefits under Ellertson’s Policy with General American. On November 9, 2004, General American denied Hejinian’s claim on the ground that Ellertson had failed to disclose that she had been diagnosed with cancer at the time the Policy was delivered. Hejinian then brought this action against General American, alleging that it breached the insurance contract, as well as the covenant of good faith and fair dealing, and committed an unfair settlement practice in violation of G.L.c. 93A and 176D by refusing to pay the death benefit on the Policy.
On July 13, 2007, this Court allowed Hejinian’s motion for partial summaiy judgment as to coverage under the Policy, and vacated the stay as to Hejinian’s claim for unfair settlement practices in violation of G.L.c. 93A and 176D. Memorandum of Decision and Order on Plaintiffs Motion for Partial Summaiy Judgment and Defendants’ Motion for Summaiy Judgment at 19 (“the First Summary Judgment Decision”) [22 Mass. L. Rptr. 684]. The parties have since conducted additional discovery as to that claim and each now cross-moves for summaiy judgment. After hearing, Hejinian’s motion for summaiy judgment is ALLOWED and General American’s motion for summaiy judgment is DENIED.
DISCUSSION
In deciding this second motion for summaiy judgment, this Court assumes familiarity with the First *409 Summary Judgment Decision. In that First Summary Judgment Decision, this Court found as a matter of law that Hejinian was entitled to coverage under his wife’s life insurance Policy. Here, this Court must determine whether, as a matter of law, General American engaged in an unfair claim settlement practice in violation of G.L.c. 176D, §3(9) (and, as a consequence, in violation of G.L.c. 93A, §2) by failing to effectuate a “prompt, fair and equitable” settlement of a life insurance claim “in which liability has become reasonably clear.” G.L.c. 176D, §3(9)(f). Since there is no dispute that the only offer of settlement that General American ever made to Hejinian was to offer him the return of his paid premiums with interest — the paltiy sum of only $335.84, General American would indeed have engaged in an unfair claim settlement practice if liability had become reasonably clear.
“Whether the defendant’s liability in this case became ‘reasonably clear’ calls for an objective standard of inquiiy into the facts and the applicable law.” Demeo v. State Farm Mut. Auto Ins. Co., 38 Mass.App.Ct. 955, 956 (1995). “That objective test calls upon the fact finder to determine whether a reasonable person, with knowledge of the relevant facts and law, would probably have concluded, for good reason, that the insurer was liable to the plaintiff.” Id. at 956-57. See also Bobick v. U.S Fidelity & Guar. Ins. Co., 57 Mass. App. 1, 7 n.6 (2003).
There is no material dispute as to the relevant facts in this case:
1. On the Medical Declarations Form of her Application for Life Insurance (“the Application”), which she signed on February 14, 2003, Ellertson answered “no” to the question as to whether in the last ten years she had been treated for or diagnosed as having any disease or disorder of the reproductive organs or breasts, or any disorder of the thyroid or lymph glands or other endocrine disorders. She answered “yes” as to whether in the last ten years she had been treated for or diagnosed as having “cancer, tumor, cyst or disorder of the skin,” but wrote that she had a “benign mole removed.”
2. There is no evidence that these answers were false. More specifically, there is no evidence that, at the time she signed this Application, Ellertson had been treated for or diagnosed as having cancer, or knew that she had cancer.
3. After receiving her Application and before issuing her life insurance Policy, General American caused Ellertson to undergo a paramedical examination. It did not require her to undergo a medical examination, which must be conducted by a licensed physician. See Robinson v. Prudential Ins. Co. of America, 56 Mass.App.Ct. 244, 245 (2002) (a “medical examination” is “an examination by a physician”).
4. By June 3, 2003, Ellertson had been diagnosed with breast cancer, and this diagnosis was confirmed in a second opinion on June 6, 2003.
5. When General American approved the Application on June 11, 2003, it did not know of Ellertson’s cancer diagnosis. If it had known, it would not have issued her the Policy.
6. When the Policy was delivered to Ellertson on June 23, 2003, it was accompanied by a Notice and Policy/Certificate Delivery Receipt (“Receipt”). The Receipt states in pertinent part:
In order to continue to provide you with quality insurance products at competitive premium rates, it is necessary that our underwriters have complete and accurate information on the lives of individuals applying for insurance. Therefore, it is only fair to you and to all of our policyholders that questions on the application are answered completely to the best of your knowledge. Please review carefully the answers recorded to the questions in the copy of the application that is attached to this policy. Contact us immediately, in writing or by calling the Home Office..., if any answers are not complete and true to the best of your knowledge and belief.
Below this information in the Receipt is what is referred to as a “Certification” which declares in pertinent part:
I acknowledge that I have received Policy Number 3,838,523 on this date and accept it as issued. The coverage provided by this policy was explained to me. I understand the insurance protection provided.
I certify that Part I and Part II (medical or non-medical) of the application were attached to this policy when it was delivered to me. I have reviewed these parts of the application and the answers provided were accurately recorded. The answers are complete, correct and true to the best of my knowledge and belief. I further certify that the information contained in these parts of the application remains true and correct to the best of my knowledge and belief as of this date. There has been no change in my health since the date of the application and/or examination for insurance.
Ellertson signed and returned this Receipt on June 23, 2003, along with a check for payment of the first premium.
7. Ellertson tragically died of cancer on March 21, 2004.
If this life insurance claim were governed by G.L.c. 175, §124, no reasonable person, applying these relevant facts, could reasonably have concluded that General American should decline coverage on this Policy. Section 124, enacted in 1892, provides:
In any claim arising under a policy issued in the commonwealth by any life company, without previ *410 ous medical examination ..., the statements made in the application as to the age, physical condition and family history of the insured shall be held to be valid and binding on the company; but the company shall not be debarred from proving as a defense to such claim that said statements were wilfully false, fraudulent, or misleading.
G.L.c. 175, §124. If §124 governed this claim, Ellertson’s statements in her Application regarding her physical condition would be “valid and binding” on General American unless General American could prove that those statements, when made, were willfully false, fraudulent, or misleading. Since General American had no evidence that Ellertson knew she had cancer when she filled out and signed her Application, General American could not possibly prove that Ellertson’s statements regarding her physical condition were willfully false, fraudulent, or misleading.
However, if this life insurance claim were governed by G.L.c. 175, §186, a reasonable person, applying these relevant facts, could reasonably have concluded that General American should decline coverage on this Policy. G.L.c. 175, §186, which was enacted in 1878, fourteen years before the enactment of G.L.c. 175, §124, provides:
No oral or written misrepresentation or warranty made in the negotiation of a policy of insurance by the insured or in his behalf shall be deemed material or defeat or avoid the policy or prevent its attaching unless such misrepresentation or warranty is made with actual intent to deceive, or unless the matter misrepresented or made a warranty increased the risk of loss.
G.L.c. 175, §186. Section 186 differs in two important ways from § 124. First, the word, “negotiation,” in §186 has been defined as “the entire transaction of applying for and finally issuing the completed contract of insurance.” Everson v. General Fire & Life Assur. Corp., 202 Mass. 169, 172 (1909). Therefore, the “negotiation” of a life insurance policy under §186 is far broader than the application for a policy under §124, since it encompasses not only the application but the entirety of the transaction leading to the issuance of the policy. Second, under §186, an insurance company justifiably may decline coverage when a policyholder made a misrepresentation in the “negotiation” of the insurance policy that increased the risk of loss, even if the misrepresentation was not willfully made. Under §124, the life insurer may only decline coverage for a misrepresentation in the application that was willful. Since Ellertson’s signing of the Receipt was arguably part of the “negotiation” of her life insurance Policy, and since she arguably made a misrepresentation that her health had not changed since the date of her Application when she signed the Receipt, a reasonable person, applying §186, could have concluded that General American should decline coverage.
The core issue, then, in determining whether General American committed an unfair settlement practice by offering Hejinian only a nominal settlement is whether a reasonable person would probably have concluded, for good reason, that this Policy is governed by §186 rather than §124. This Court finds that no reasonable person who made a reasonable inquiry into the controlling Massachusetts case law could have come to that legal conclusion.
Any life insurance company doing business in Massachusetts should be expected to know the Massachusetts statutes that govern the determination of coverage. Therefore, General American should certainly have known of §124. In any event, it certainly knew of it here, because Hejinian’s counsel repeatedly invoked the statute in his letters demanding coverage. Any rudimentary legal research into §124 would have included a review of the case annotations in Massachusetts General Laws Annotated, which would quickly have revealed at least two Massachusetts appellate cases that analyzed the scope of §124: Torres v. Fidelity & Guaranty Life Ins. Co., 34 Mass.App.Ct. 376, 380 (1993), and Protective Life Ins. Co. v. Sullivan, 425 Mass. 615, 631 (1997). Torres clearly and succinctly declares that an insurer may not invoke the defenses of §186 to deny coverage on a life insurance policy issued without a medical examination. Indeed, the decision is so short and succinct that its entire text, without footnotes, can be reprinted below:
This case involves the interrelationship between §§124 and 186 of G.L.c. 175. More particularly, the question before us is whether a life insurance policy, issued without previous medical examination, is defeated by a misrepresentation which increases the risk of loss to the insurer but is not found to be wilfully false, fraudulent, or misleading. A judge of the Superior Court held that the life insurance policy issued to the plaintiffs husband may not be so defeated. We affirm.
On April 18, 1986, the plaintiffs husband, Erickson Torres (Torres), assisted by an insurance broker, completed an application for life insurance with the defendant, naming the plaintiff as primary beneficiary. The broker filled out the application by asking Torres a series of questions and filling in or checking off his answers; thereafter Torres signed the application. A policy was issued by the defendant without a medical examination. On January 27, 1987, Torres died while the policy was in full force. Relying on G.L.c. 175, §186, . . . the defendant denied coverage, alleging that Torres had made material misrepresentations of fact in the application which resulted in an increased risk of loss to the company. The judge, while finding that Torres’s failure to disclose a history of Hepatitis B symptoms and liver problems had increased the risk of loss to the insurer, ruled that §124, . . . was controlling and that the insurer had failed in sustaining its *411 burden under that statute of proving that the statements were wilfully false, fraudulent, or misleading. He thus concluded that §124, which specifically deals with life insurance without a medical examination, is the governing statute and that §186, which pertains to all types of policies, does not apply.
Section 186, set forth in the margin, adopted in 1878, and applicable to all insurance policies, provides that a misrepresentation is not material unless it is made with actual intent to deceive or unless it increases the risk of loss. Section 124, a later provision, adopted in 1892, also set out in the margin, provides that where a life insurance policy is issued without a previous medical examination, the statements in the application are binding on the insurer unless it proves such statements were wil-fully false, fraudulent, or misleading.
As the judge pointed out, if §186 also applies to life insurance policies issued without medical examination, § 124 would be virtually meaningless. Under the defendant’s construction, §124 would apply only in those limited circumstances, if any, in which the words “wilfully false, fraudulent or misleading” (§124) were found to have a broader scope than a “misrepresentation . . . made with actual intent to deceive.” (§186) “Such [an ineffective] result ought not to be imputed to the Legislature in enacting a statute unless no other result can be reached reasonably.” Boston & Maine R.R. v. Hartford Fire Ins. Co., 252 Mass. 432, 436 (1925). “It must be presumed that the Legislature intended to accomplish something substantial by the enactment of the later statute. It must be presumed also in this connection that the Legislature was aware of [§186].” Id. at 435.
Moreover, where two provisions are in conflict, if a specific provision (life insurance policy issued without medical examination) is enacted subsequent to a more general rule, the specific and not the general provision applies. 2B Singer, Sutherland Statutory Construction §51.02, at 121 (5th ed. 1992).
Our interpretation of the statutoiy scheme is also confirmed by the legislative history of §124. Under G.L.c. 175, §17, the Commissioner of Insurance is required to report annually to the Legislature. His Thirty Third Annual Report (1888), part two at vii, discussed industrial insurance, then a new and growing branch of the business of life insurance, and specifically recommended that:
if... risks are taken without a medical examination, alleged misrepresentation by the applicant — who in a large number of these cases is made to understand next to nothing of the statement he is asked to sign — as to his physical condition, ought not to be permitted as a bar when a claim arises. Misrepresentation by the agent and misunderstanding by the assured now lead, under the methods thus pursued, to almost innumerable cases of hardship and injustice.
The Commissioner repeated this recommendation in his Thirty Fourth Annual Report, part two at vii, in 1889, and again in his Thirty Sixth report, part two, in 1891, when he wrote, at viii, that he:
would repeat and emphasize the suggestion, twice before made in these reports, that when any company effects insurance upon a life, without medical examination, it should be forbidden from setting up, as a bar to any claim, alleged misrepresentation by the insured as to his family history or his physical condition at the time the policy was issued . . .
Since §186, see St. 1878 c. 157, §1, see also St. 1887, c. 214, §21, was already on the books when the Commissioner made his recommendation, it is evident that the Legislative intent, based on the Commissioner’s report, in enacting §124 was to preclude the insurer from raising any defenses not contained in §124. See also Taylor, The Life Insurance Law of Massachusetts, 19 B.U.L.Rev. 53, 112 (1939), where the author, an associate counsel of the John Hancock Mutual Life Insurance Company, wrote:
The later statute [§124] in effect carves an exception out of the earlier one [§186] and renders it inapplicable to cases within the ambit of the later one. Both statutes made a fraudulent statement a defence, but the later one makes no reference to an increase in the risk of loss . . .
Based on our analysis, we hold that the defenses of §186 are not available to the insurer and, since it did not sustain its burden under §124, the judgment is affirmed.
Torres at 376-80.
Protective Life Ins. Co. did not in any way reverse or even distinguish the controlling authority in Torres. Indeed, it cited Torres with approval. 425 Mass. at 623-24. In Protective Life Ins. Co., the Supreme Judicial Court focused on the specific certified question of whether §124 should be interpreted to add a fraud exception to G.L.c. 175, §132, which requires all Massachusetts life insurance policies to provide that, after the policy has been in force during the lifetime of the insured for two years, the policy cannot be contested by the insurer for any but three specific reasons, none of which included fraud. Id. at 620. The Court concluded:
The purpose of G.L.c. 175, §124 (based on the commissioner’s recommendation), was to curb perceived unfair practices by insurance companies, by making it even more difficult for them to contest life insurance policies issued without medical examinations than it was to contest life insurance policies issued with medical examinations. We conclude, therefore, that the effect of G.L.c. 175, §124, when *412 read together with the later enacted §132 (see St. 1907, c. 576, §75), is to increase the insurers’ burden of proof when it attempts to rescind, within two years, life insurance policies issued without medical examinations. Neither the purpose nor the effect of G.L.c. 175, §124, was to create a fraud exception to the later enacted incontestability statute.
Id. at 625 (footnote omitted). Consequently, even a cursory examination of G.L.c. 175, §124 would have revealed controlling case law that clearly held that §124, not §186, applies to life insurance policies issued without medical examinations, and that the purpose of §124 was to increase the insurer’s burden of proof to deny coverage by requiring proof of a willful misrepresentation in the insurance application.
General American’s claim representatives ignored § 124 in denying coverage and then sought legal advice that justified its denial of coverage by misrepresenting both the facts and the governing law. General American has admitted that its written policy since 1967 has been to decline coverage on life insurance claims whenever there was an undisclosed material change in the insured’s insurability after the date of the application but before payment of the premium. It also admits that this policy does not distinguish between life insurance policies issued with medical examinations and those issued without. Nor does this policy vary by state. In short, General American, as a matter of policy, has not complied with §124 by considering statements made in the application for life insurance as to the age, physical condition and family history of the insured to be “valid and binding on the company” when no medical examination has been required, unless the statements were wilfully false, fraudulent, or misleading. For all practical purposes, it has acted as if §186 (or a comparable state statute) governed the issue of coverage as to all its life insurance policies. Consequently, when General American denied coverage and declared the Policy void on November 9, 2004, the declared basis for its decision was not any willful misrepresentation made by Ellertson in her Application on February 14, 2003 but the fact that she failed to disclose at the time the Policy was delivered that she had been treated “on several occasions from May 7, 2003 to June 17, 2003 for a condition which is serious from an underwriting standpoint.”
Hejinian’s attorney protested the denial of coverage in a letter to General American on March 2, 2005, appending a copy of §124 and a Massachusetts Superior Court case, Sacks v. Sun Life Assurance Company of Canada, 16 Mass. L. Rptr. 461 (2003), in which Judge Paul Chemoff, relying on §124, ruled that, when a life insurance company does not require a medical examination, it may not void the policy when the insured is diagnosed with cancer after the application has been completed but before the policy is issued. On March 30, 2005, General American’s senior technical claims advisor asked its Associate General Counsel for Policy Litigation to advise whether the denial of coverage was improper and specifically to consider the applicability of §124 and Sacks to Hejinian’s claim. On April 13, 2005, the Associate General Counsel asked outside counsel James Ciapciak to respond to Hejinian’s Chapter 93A demand letter. Ciapciak asked his associate, Peter LeB-lanc, to prepare a legal memorandum, which he completed on April 15, 2005. In that memorandum, LeBlanc makes numerous, rather extraordinary, errors of fact and law:
Although General American’s senior technical claims advisor and Associate General Counsel had stated that Ellertson received only a paramedical examination, not a medical examination, and although LeBlanc correctly cites Robinson v. Prudential Ins. Co. of America, 56 Mass.App.Ct. 244 (2002), for its holding that a medical examination must be conducted by a physician, LeBlanc still stated that “we can argue that an examination for §124 purposes was undertaken and Met Life[1] should not be bound by the statements in the application.”
Although General American’s senior technical claims advisor and Associate General Counsel had stated that Ellertson had been diagnosed with cancer months after she completed her Application, LeBlanc declared that she failed to disclose in her application that she had a scheduled appointment at the Cancer Risk and Prevention Clinic in August 2003. This appointment, in fact, was not scheduled until April 17, 2003, more than two months after the Application had been completed, and was intended to help Ellertson manage the risk of developing breast cancer (since she had a family histoiy of breast cancer) rather than to treat her for any diagnosed breast cancer.
LeBlanc correctly observed that Sacks holds “. . . that §186 is not intended to apply to situations where the insurer has elected not to require a medical examination of its applicant,” but then declares that “(t]here is no support for that holding in the statute itself.” LeBlanc failed apparently to note that there could not possibly be support for this finding in the language of §186, since it was enacted fourteen years before §124. LeBlanc also failed even to cite Torres or Protective Ufe Ins. Co., so he failed to recognize the controlling appellate authority supporting the Sacks holding.
In short, LeBlanc’s guidance can effectively be summed up as suggesting that General American can argue that §186 should apply because Ellertson had a medical examination (even though she did not), or that §186 could still apply even without a medical examination (despite the holdings of Torres, Protective Life Ins. Co., and Sacks), or that Ellertson made a willful misrepresentation in her Application (even though she did not). Ciapciak adopted these meritless *413 arguments in responding to Hejinian’s Chapter 93A demand letter on May 9, 2005.[2]
General American now claims that, as a matter of law, its denial of coverage cannot be found to be unreasonable because it relied on the advice of counsel, citing Boston Symphony Orchestra v. Commercial Union Ins. Co., 406 Mass. 7 (1989). The advice of counsel defense, however, does not give an insurance company a blank check to decline coverage as long as it finds an attorney willing to support its declination. Rather, the standard embraced by the Supreme Judicial Court provides simply that if “an insurance company reasonably relies on the diligent, good faith evaluation of the case, by its counsel, this may be considered as some evidence of good faith.” Hartford Cas. Ins. Co. v. New Hampshire Ins. Co., 417 Mass. 115, 122 n.5 (1994). In Boston Symphony Orchestra, “(t]here was no applicable precedent with regard to the coverage issue in this case when Commercial Union denied coverage,” and the Court concluded, in part because Commercial Union had “asked for, received, and relied upon an opinion from outside counsel regarding its liability under the policy,” that Commercial Union, in good faith, “relied upon a plausible, although ultimately incorrect, interpretation of its policy.” Boston Symphony Orchestra, 406 Mass. at 14-15. Here, in contrast, there was applicable controlling appellate precedent that governed the coverage issue, which counsel ignored. For the reasons earlier articulated, counsel’s opinion in this case was neither diligent nor in good faith, and could not have been reasonably relied upon by General American.
Once litigation commenced, General American conjured two new arguments that it had not previously made in declining coverage. First, it argued that the Receipt should be viewed as part of the Application, so that a willful misrepresentation in the Receipt should be treated as a defense to coverage under §124. This Court has already addressed at length in its First Summary Judgment Decision why this argument fails as a matter of law. See First Summary Judgment Decision at 13-16. It also fails as a matter of undisputed fact. General American’s senior technical claims advisor and Associate General Counsel both stated that Ellertson had completed the Application on February 14, 2003; neither characterized the Receipt as part of the Application or as a new Application. Indeed, at deposition, General American’s senior technical claims advisor testified that, in her roughly forty years at Met Life, she had never heard anyone refer to the Application as an “initial application,” which is how General American’s counsel sought to characterize it in order to characterize the Receipt as the final application.
Second, General American placed enormous weight on the United States Supreme Court decision of Stipcich v. Metropolitan Life Ins. Co., 277 U.S. 311 (1928), which declared that the “generally recognized rule” was that the “failure by the insured to disclose conditions affecting the risk, of which he is aware, makes the contract voidable at the insurer’s option,” even when the changes in condition “come to the knowledge of the insured after the application and before delivery of the policy.” Id. at 316-18. Stipcich, however, was a diversity action under Oregon law and the Supreme Court made clear that it found the “generally recognized rule” to be the law of Oregon only “in the absence of authoritative local decision” or contrary state statutes. Id. at 318. Even if the “generally recognized rule” in 1928 were still the generally recognized rule today, it would not be the rule in Massachusetts, where §124 and authoritative state appellate decisions declare a different rule governing life insurance policies issued without a medical examination.
In conclusion, this Court finds, as a matter of law, that a reasonable insurer with knowledge of the relevant facts and the governing law in Massachusetts would have concluded, for good reason, that Hejinian was entitled to coverage under his late wife’s life insurance Policy. See Demeo v. State Farm Mat. Auto Ins. Co., 38 Mass.App.Ct. at 956. As a result, this Court finds, as a matter of law, that General American committed an unfair settlement practice in violation of G.L.c. 176D, §3(9)(f) and G.L.c. 93A, §2 by offering Hejinian only the return of the premium payments as a settlement of his claim.
General American’s unreasonable refusal to acknowledge coverage and to make any settlement offer beyond the return of premium payments left Hejinian with no real choice other than to file this action, undergo the rigors of prolonged litigation, and support him and his children without the $1 million in life insurance that his wife had sought to provide in the event of her death. This is precisely the bad faith conduct that G.L.c. 176D, §3(9)(g) was designed to prevent. See R.W. Granger & Sons, Inc. v. J&S Insulation, Inc., 435 Mass. 66, 77 (2001) (G.L.c. 176D, §3(9) (g) “expresses a legislative purpose to penalize the practice of ‘low balling,’ i.e. offering much less than a case is worth in a situation where liability is either clear or highly likely”), quoting Guity v. Commerce Ins. Co., 36 Mass.App.Ct. 339, 343 (1994). Since General American never made a serious settlement offer, Hejin-ian has no obligation to prove that he would have accepted a reasonable settlement offer. See Hopkins v. Liberty Mut Ins. Co., 434 Mass. 556, 568 (2001) (“when the defendant failed to make any offer at all, the plaintiff should not be required to show that she would have accepted a hypothetical settlement offer, had one been forthcoming”).
This Court further finds, as a matter of law, that Great American’s violation of G.L.c. 176D, §3(9)(f) and G.L.c. 93A, §2 was willful and knowing, and justifies a trebling of damages. G.L.c. 93A, §11 provides a remedy of multiple damages where an insurer “forc[es] *414 plaintiffs to litigate clearly valid claims.” R.W. Granger & Sons, Inc., 435 Mass. at 78, quoting International Fld. Ins. Co. v. Wilson, 387 Mass. 841, 857 (1983). Here, as earlier discussed, General American, in defense of its denial of coverage, argued many facts that it knew to be false or for which it had no evidence. When it realized that it had no evidence to support its contention that Ellertson knew she had cancer when she filled out the Application on Februaiy 14, 2003, it conducted substantial discovery in a futile effort to find that she did, requesting Ellertson’s home and cell phone records, subpoenaing the medical facilities from whom it had earlier obtained Ellertson’s medical records to obtain another copy of her records, and deposing five physicians who treated her from May 2003 until her death. As a matter of company policy, it ignored the existence of §124 and then made legal arguments that it knew or should have known were contrary to controlling appellate case decisions. Indeed, even after this Court decisively ruled in Hejinian’s favor on summary judgment, General American never made a settlement offer; it simply engaged in an acrimonious debate with Hejinian as to whether mediation would prove fruitful. “An insurer’s statutory duty to make a prompt and fair settlement offer does not depend on the willingness of a claimant to accept such an offer.” Hopkins v. Liberty Mut. Ins. Co., 434 Mass. at 566. See Metropolitan Prop. & Cas. Ins. Co. v. Choukas, 47Mass.App.Ct. 196, 200 (1999).
Under the 1989 amendment to G.L.c. 93A, §11, “the amount of actual damages to be multiplied by the court shall be the amount of the judgment on all claims arising out of the same and underlying transaction or occurrence regardless of the existence or nonexistence of insurance coverage available in payment of the claim.” St. 1989, c. 580, §2. The Supreme Judicial Court has interpreted this provision to require that, “(i]f... the defendant is subject to multiple damages and the plaintiff has recovered a judgment on the underlying claim, ‘actual damages’ shall be taken to be the amount of the judgment for the purpose of bad faith multiplication.” R.W. Granger & Sons, Inc, 435 Mass. at 82, quoting Kapp v. Arbella Mut. Ins. Co., 426 Mass. 683, 685 (1998). Here, that means that General American must pay Hejinian three times the underlying judgment of more than $1 million — more than $3 million — plus the attorneys fees that Hejinian incurred in prosecuting this action.[3]
This Court recognizes that the trebling of damages is a heavy price for General American to pay, but it believes it an appropriate price in light of its conduct towards this claim. Perhaps now General American will recognize that it must comply with the dictates of §124 when it adjudicates life insurance claims in Massachusetts issued without medical examination, and that it cannot conjure facts and ignore controlling case law to avoid payment on a life insurance claim.
ORDER
For the reasons stated above, this Court ORDERS that;
1. Hejinian’s motion for summary judgment as to his claim under G.L.c. 176D and 93A is ALLOWED and General American’s motion for summary judgment is DENIED.
2. This Court finds, as a matter of law, that General American’s violation of G.L.c. 176D and 93A was willful and knowing, and justifies a trebling of damages.
3. Hejinian is entitled to actual damages in the amount of the $1 million face value of the Policy, plus contractual interest at four percent per annum from July 15, 2004 until September 15, 2004, plus statutory interest from that date until the date of judgment, plus twice actual damages as punitive damages, resulting in treble damages.
4. Hejinian is also entitled to recover the attorneys fees and costs incurred in prosecuting this action. No later than January 30, 2009, Hejinian shall serve an application for these attorneys fees and costs, supported by affidavit and appropriate documentation. No later than February 20, 2009, General American may serve an opposition to the application. Hejinian may serve a reply no later than February 27, 2009, and the Rule 9A package shall be promptly filed. A hearing on the application for attorneys fees shall be conducted on March 12, 2009 at 2 p.m.
5. Each party is invited to provide the Court with a proposed form of judgment at or before this hearing.

Metropolitan Life Insurance Company (“Met Life”) was the corporate parent of General American and handled its underwriting and claim decisions.

Ciapciak’s failure to cite Torres cannot be blamed on the careless work of his associate. In 1995, Ciapciak had been one of the counsel of record representing Met Life in the federal case of Hardick v. Metropolitan Life Ins. Co., in which Judge Ponsor adopted Magistrate Judge Neiman’s Report and Recommendation of Court on Defendant’s Motion for Summary Judgment, which denied Met Life’s motion for summary judgment. 1995 WL 852063 (D.Mass.). Magistrate Judge Nieman had found that the limited defenses in §124, rather than the broader defenses in §186, applied because the life insurance policy had been issued without a prior medical examination, and declared the reasoning in Torres to be “compelling” on this issue.

Apartfrom the $1 million face value of the Policy, Hejinian is also entitled under the Policy to interest at four percent per annum from July 15, 2004 (the date that he provided General American with proof of Ellertson’s death) until September 15, 2004 (the two-month period in which settlement under the Policy should have been made). After that date, the Policy does not set an interest rate, so the statutory rate of twelve percent simple interest applies until the date of judgment.